FROSTAR CORP.[1] & another[2] *vs.* MARTIN J. MALLOY[3]
& others.[4]

No. 03-P-851.

Suffolk. September 10, 2004. - March 7, 2005.

Present: DUFFLY, COHEN, & GREEN, JJ.

*Real Property,* Sale, Right of first refusal, Purchase and sale agreement.
*Contract,* Sale of real estate, Implied covenant of good faith and fair deal-
ing, Performance and breach, Damages. *Consumer Protection Act,* Sale of
commercial property.

In a civil action brought by plaintiffs who had sought unsuccessfully to
purchase commercial real estate from certain of the defendants, the
plaintiffs' claim that the defendants had breached their obligations under
the right of first refusal provision contained in the lease agreement between
the parties failed as a matter of law, where the plaintiffs' rights under the
provision, which were triggered by a third party's offer to buy (and its
subsequent renewal of that offer), were superseded by the purchase and
sale agreement that the parties later executed. [102-104]

In a civil action brought by plaintiffs who had sought unsuccessfully to
purchase commercial real estate from the defendants, a new trial was
required on certain of the plaintiffs' contract claims, where although there
was adequate support in the evidence for the jury's conclusion that a
certain defendant failed to discharge his obligations under both the purchase
and sale agreement and the implied covenant of good faith and fair dealing
(and although that failure relieved the plaintiffs of their obligation to
tender performance on the designated closing date), the jury were not
properly instructed on an element essential to their verdict, namely, that in
order to place the defendants in breach, the plaintiffs were required to
show that they were ready, willing, and able to perform. [104-108]

In a breach of contract action, an express provision in a purchase and sale
agreement, which waived damages in all circumstances, precluded a jury's
damage award; however, the judge did not abuse her discretion in ordering
specific performance as a remedy. [108-109]

This court discerned no error in a trial court judge's ruling that a defendant's
conduct did not violate G. L. c. 93A. [109]

---

[1]Formerly known as Commercial Cold Storage Corporation.

[2]Frostar Inc.

[3]As trustee of the 33 Norfolk Avenue Realty Trust.

[4]Michael S. Lapuck and Kenneth M. Lapuck, as trustees of the RFD Realty
Trust; the 1164 Washington Street Realty Trust; and Royal Fire Door
Company, Inc.

CIVIL ACTION commenced in the Superior Court Department on March 2, 1998.

The case was tried before *Carol S. Ball*, J.

*Thomas Bhisitkul (Stacey Coady* with him) for the plaintiffs.

*William E. Gens* for Martin J. Malloy.

*James R. DeGiacomo (Elizabeth A. Kowal* with him) for Michael S. Lapuck & another.

GREEN, J. In their Superior Court jury trial, the parties advanced conflicting theories to explain why plaintiff Frostar Inc. did not close on the purchase from defendant Martin J. Malloy, as trustee of the 33 Norfolk Avenue Realty Trust, of real estate located at 16 Howard Street in the Roxbury section of Boston. Frostar contended that Malloy had wrongfully withheld a promised environmental report until virtually the eve of closing, that the report when finally furnished was inadequate, and that Malloy compounded the situation by refusing in bad faith to extend the closing date for a reasonable time to allow Frostar to obtain its own, more detailed report. Malloy argued that Frostar, strapped for cash at the time of the scheduled closing, expressed concerns with the environmental report as a pretext, in an unsuccessful effort to delay the closing date until its financial circumstances improved. In answers to a series of special questions, the jury found in the plaintiffs' favor and awarded damages. The jury also made an advisory finding that Malloy's actions violated G. L. c. 93A; the trial judge declined the jury's recommendation on the c. 93A count and entered judgment in Malloy's favor.[5] The judge entered an order for specific performance, directing conveyance of the property to Frostar, but stayed that order pending appeal.[6]

The parties filed cross appeals: the plaintiffs appeal the judge's finding that Malloy did not violate c. 93A and the order staying specific performance; the defendants appeal the judgment for the plaintiffs on the three counts sounding in contract,

[5]The judge accepted the jury's recommendation that defendants Michael S. Lapuck and Kenneth M. Lapuck, as trustees of the RFD Realty Trust, the 1164 Washington Street Realty Trust, and Royal Fire Door Company, Inc., were not liable under G. L. c. 93A.

[6]The judge also denied the defendants' motions for judgment notwithstanding the verdict, to alter or amend the verdict, for remittitur, and for a new trial.

the award of damages, and the order for specific performance. We reverse the judgment on the three contract counts, and remand the matter for a new trial.[7]

*Background.* The evidence before the jury was extensive and complex; we summarize it in the light most favorable to the plaintiffs, drawing additional elements from the record as necessary in our discussion of the issues. On October 1, 1984, Frostar Corp. entered into a lease with Malloy of the premises at 16 Howard Street[8] in the Roxbury section of Boston.[9] The lease included a right of first refusal, pursuant to which Frostar Corp. held the right to match any bona fide offer by a third party to purchase the property.[10]

In 1996, Malloy listed the property for sale with a real estate agent. On or about May 16, 1996, Frostar Inc. submitted an offer to purchase the property for $300,000, but Malloy declined the offer and the property remained on the market. On November 4, 1997, defendant Michael Lapuck, as trustee of the 1164 Washington Street Realty Trust, submitted to Malloy's agent a written offer to purchase the property. In addition to a

---

[7]We affirm the judgment dismissing the c. 93A count against Malloy. As will be seen, only two of the three contract counts require a retrial; the claim in count I of the complaint, that Malloy breached a right of first refusal held by Frostar, shall be dismissed.

[8]16 Howard Street is also known as 33-35 Norfolk Avenue.

[9]As of the date of the lease, Frostar Corp. was doing business as Commercial Cold Storage — Howard Street Division, Inc. The lease provided for a term of ten years, with an option to renew for an additional ten years, and was in effect during all periods relevant to the present controversy.

[10]Paragraph 26 of the lease provided as follows:

"*Right of First Refusal to Purchase*: In the event Lessor shall receive a bona fide offer to purchase the Leased Premises or any property of which it is a part during the term of this lease, and the offer of purchase shall be satisfactory to Lessor, Lessor shall give Lessee the privilege of purchasing the premises at the price and on the terms of the offer so made. This privilege shall be given by a notice sent to Lessee at the Leased Premises by certified mail, return receipt requested, requiring Lessee to accept the offer in writing and to sign a suitable Purchase and Sale Agreement for the premises within the period of fifteen (15) days after the mailing of the notice.

"The failure of the Lessee to accept the offer to purchase or sign a contract within the period provided shall nullify and void the privilege to Lessee; and Lessee [*sic*] shall be at liberty to sell the premises to any other person, firm, or corporation. Any subsequent sale, except to Lessee, shall be subject to this lease and any renewals or extensions thereof."

purchase price of $287,500, Lapuck's offer proposed the following additional terms: (i) an initial deposit of $1,000, to be paid upon acceptance of the offer; (ii) the offer was contingent on the parties' execution of a mutually satisfactory purchase and sale agreement that, when executed, would be the agreement between the parties; (iii) an additional deposit of $13,375, to be paid upon execution of the above-described purchase and sale agreement; (iv) closing would occur within sixty days following execution of the purchase and sale agreement; and (v) the buyer's obligations were conditioned on (a) the buyer obtaining first mortgage financing for seventy-five percent of the purchase price, and (b) the buyer's satisfaction with the results of the buyer's inspections of the property. The offer further provided that the seller would provide "a current environmental report on the property that is satisfactory to Buyer and Buyer's Lender and demonstrate compliance with all Federal and Massachusetts regulations, thirty days from signing of Purchase and Sale Agreement. A copy of any previous environmental reports is to be delivered to Purchaser within five days of acceptance of this Offer."

On November 5, 1997, Frostar[11] received by facsimile a copy of the Lapuck offer. Shortly thereafter, Candeloro J. Maggio, Jr., acting on behalf of Frostar, informed Malloy's attorney that he wished to match the Lapuck offer.

Malloy's attorney sent a draft purchase and sale agreement to Maggio on or about November 18, 1997, and negotiations over the form of the agreement continued through the exchange of three drafts over the next month. Maggio faxed to Malloy's attorney a signed signature page of the third draft of the agreement on December 20, 1997. Maggio also mailed two signed copies of the agreement to Malloy's attorney, but the attorney

---

[11]The two named plaintiffs in the present action, Frostar Corp. and Frostar Inc., are affiliated entities; both are wholly owned by Frostar Industries, Inc., which, in turn, is wholly owned by Candeloro J. Maggio, Jr. Frostar Corp. was the lessee under the above-described lease (and the holder of the right of first refusal it created), while Frostar Inc. was purchaser under the purchase and sale agreement at the center of the present dispute, by assignment of the rights held by Frostar Corp. For convenience in this opinion, we hereinafter refer to the plaintiffs interchangeably as Frostar, except where the context requires more specific reference, or as Maggio, when he is acting on Frostar's behalf.

never received them. At the attorney's request on January 12, 1998, Maggio signed and returned by overnight mail an additional copy of the agreement. After Malloy signed the agreement his attorney sent a facsimile cover sheet to Maggio on January 20, 1998, stating that the fully signed agreement was "attached." However, the agreement did not accompany the facsimile cover sheet; Maggio telephoned Malloy's attorney to advise her of the omission, and the attorney assured him that she would deliver a copy to his New Hampshire office "right away." As of January 30, 1998, however, Maggio still had not received a fully signed copy of the agreement; in fact, Maggio did not receive a signed copy of the agreement until after he filed his complaint in the present action. Even without having received the purchase and sale agreement, however, Maggio delivered to Malloy's attorney a check for the additional deposit of $13,375 on February 18, 1998.

As executed by the parties, the agreement provided for a closing date of March 1, 1998.[12] The agreement also (in paragraph 5[a] thereof) required Malloy as seller to furnish Frostar with "an environmental study of the property." The agreement was silent regarding the features or scope of the required report, but provided that Malloy would not be responsible for any costs of the report in excess of $2,000. The agreement further provided that (i) Malloy would not be required to remedy any conditions disclosed by the report; (ii) Frostar could not rely on any reports furnished by Malloy; and (iii) during the period beginning December 10, 1997, and ending January 19, 1998, Frostar could perform additional environmental studies if it wished, subject to Malloy's reasonable approval. Paragraph 5(c) of the agreement provided that if the results of Frostar's inspections were unsatisfactory to it, Frostar would have the right, as its sole and exclusive remedy, to terminate the agreement and receive a return of its deposit. That termination right expired on January 19, 1998, except that if Malloy did not deliver the required environmental report to Frostar prior to January 14, 1998, Frostar's right to terminate the agreement by reason of dissatisfaction with conditions

---

[12]March 1, 1998, was a Sunday; accordingly, the closing fell to the following day.

disclosed by the environmental report would extend to the fifth day after Frostar received the report.

By the time Malloy signed the purchase and sale agreement on January 20, 1998, the dates specified in paragraph 5 had already passed. Moreover, as noted, Maggio had not received a copy of the agreement even then. Maggio did not receive an environmental report from Malloy until February 17, 1998, less than two weeks before the scheduled closing date but almost three weeks after Malloy's attorney had received it.[13] When finally delivered, the environmental report raised more questions than it answered. Among other concerns, the report reflected that past occupants of the building had conducted a dry cleaning business on the property, and that a "sheen" was visible on the surface of standing water in the basement. The study did not include tests of any subsurface soil or water, and the consultants who prepared the report did not inspect portions of the building leased to tenants other than Frostar. In a series of telephone calls to Malloy's attorney, Maggio expressed various concerns with the adequacy of the report, and with the potential risks it identified. When Malloy's attorney made it clear that Malloy considered the report complete and was unwilling to furnish additional information on environmental conditions at the site, Maggio requested a two-week extension of the closing date to allow him to conduct his own further study. Malloy was unwilling to agree to an extension of the closing date.

At trial, Malloy argued that he believed Frostar had no intention of closing on the scheduled closing date; Maggio had not engaged an attorney to represent Frostar at the closing, obtained a title examination, or reviewed closing adjustments or the proposed form of deed. Similarly, Maggio had not advised Malloy's attorney whether he (Maggio) intended to finance the purchase or to fund the purchase from his own cash resources. Maggio did not appear at the time and place scheduled for closing to tender the required purchase price. According to Malloy, Maggio (and Frostar) lacked the financial resources as of the scheduled closing date to close on the property, and employed

---

[13]Malloy's attorney received the environmental report on January 28, 1998.

the claim of inadequacies in the environmental report as a pretext in an unsuccessful attempt to postpone the closing.

On March 2, 1998, the scheduled closing date (see note 12, *supra*), Frostar filed a complaint in the Superior Court claiming breach of contract by Malloy, seeking specific performance and damages, and requesting a preliminary injunction against sale of the property to any other party. When its request for a preliminary injunction was denied, Frostar obtained endorsement of a memorandum of lis pendens, which it recorded in the registry of deeds. Nonetheless, on March 5, 1998, Malloy entered into a purchase and sale agreement with the Lapucks, and the Lapucks closed on the purchase of the property on May 7, 1998.[14]

*Discussion.* The jury found that Malloy's actions constituted a breach of his obligations to Frostar Corp. under the right of first refusal, a breach of his obligations to Frostar Inc. under the purchase and sale agreement, and a breach of the covenant of good faith and fair dealing. The jury awarded damages to both plaintiffs in the amount of $842,500.[15] Though the judge denied the defendants' motions for judgment notwithstanding the verdict, the judge took a somewhat different view of the evidence than the jury, declining the jury's recommendation of a finding that Malloy's actions violated G. L. c. 93A.[16] We discuss the issues raised in the parties' cross appeals in turn.

1. *The defendants' appeal.*

a. *Right of first refusal.* The defendants contend that the trial judge erred in denying their motion for judgment notwithstanding the verdict on Frostar's claim for breach of the right of first

---

[14]Incident to the closing, the Lapucks agreed to indemnify Malloy against loss or damage resulting from Frostar's suit, and to defend Malloy in the suit.

[15]In ordering sale of the property to Frostar as specific performance of the purchase and sale agreement, the judge reduced the damages award by $287,500, the purchase price payable under the agreement.

[16]In so doing, the judge expressed her view that "Maggio dragged his feet during the sale process. It appeared that he hoped to defer closing and the attendant obligation to pay a significant sum of money as long as possible, possibly due to his ongoing divorce proceedings. Maggio waited until the last moment to register every objection and then used his late expressed concerns to justify his request for an extension of time. He took all these actions knowing full well that the Malloys were in dire financial [straits]."

refusal because it was superseded by the purchase and sale agreement the parties later entered. We agree.

"A right of first refusal is not an option to purchase property at a certain price, but a limitation on the owner's ability to dispose of property without first offering the property to the holder of the right at the third party's offering price. . . . The owner's obligation under a right of first refusal is to provide the holder of the right seasonable disclosure of the terms of any bona fide third-party offer. . . . It is the prerogative of the holder then to decide whether to purchase the property at that price." *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp.*, 441 Mass. 376, 382-383 (2004) (footnote and citations omitted). Upon notice of a bona fide offer to purchase, the right of first refusal ripens into an option to purchase the property at the price and otherwise on the terms stated in the offer. See *Mucci* v. *Brockton Bocce Club, Inc.*, 19 Mass. App. Ct. 155, 159 (1985).

To support its contention that it holds independent rights under the right of first refusal that survived execution of the purchase and sale agreement, Frostar cites *Zolner* v. *THN Invs., Inc.*, 21 Mass. App. Ct. 927 (1985), which held that an option to purchase was not superseded by a subsequent purchase and sale agreement that terminated upon failure of a condition contained in it but not in the option. *Id.* at 927-928. Frostar contends that, to the extent the terms of the purchase and sale agreement were less favorable to it than those contained in the Lapuck offer which triggered the right of first refusal (specifically on the subject of the seller's obligation to furnish an environmental report), it retained its right to insist upon a purchase in strict conformity with the terms contained in the Lapuck offer despite its execution of the subsequent purchase and sale agreement.

Whatever merit there may be to Frostar's contention that rights under a right of first refusal survive execution of a purchase and sale agreement containing terms in some measure less favorable than those contained in the triggering offer,[17] it is unavailing in the present case, if for no other reason than that

---

[17]In *Mucci* v. *Brockton Bocce Club, Inc., supra* at 161, we suggested in dictum the possibility that the holder of a right of first refusal might preserve

the triggering offer stated by its terms that the purchase and sale agreement, when executed, would become the agreement of the parties; accordingly, by the terms of the offer itself the subsequent purchase and sale agreement superseded the terms of the offer.[18]

Frostar separately argues that Malloy breached his obligations under the right of first refusal when he agreed to sell the property to the Lapucks under a new offer submitted after March 2 passed without a close of the transaction between Frostar and Malloy. However, the offer Malloy accepted was less a new offer to purchase than a renewal of Lapuck's earlier offer, which triggered Frostar's exercise of its refusal right.[19] Any right triggered by that offer was superseded by the purchase and sale agreement Frostar entered.[20]

As matter of law, Frostar's claim of a breach of the right of first refusal failed, and it was error to deny the defendants' motion for judgment notwithstanding the verdict as to that claim.

b. *Breach of purchase and sale agreement and of implied covenant of good faith and fair dealing.* In challenging the trial judge's denial of their motion for judgment notwithstanding the

---

his right to challenge the bona fide nature of the triggering offer, and to rescind the purchase or recover damages if the offer was not bona fide, even after proceeding with purchase of the property. We express no view on whether as a general proposition the holder of a right of first refusal may agree to modifications of terms during the negotiations of a purchase and sale agreement triggered by a third-party offer, and claim a breach of the refusal right by reason of those agreed modifications, even after closing the purchase.

[18]We also note that paragraph 23 of the purchase and sale agreement contained a standard "merger clause," which stated that all prior agreements and understandings of the parties with respect to the transaction were merged into the agreement.

[19]Frostar's contention that Lapuck's "new" offer was materially different from the offer that triggered the right of first refusal is specious. The subsequent offer contained only minor differences from Lapuck's original offer concerning the procedures for assessment of the environmental condition of the property, and those differences were less favorable to the buyer.

[20]Malloy's contention that he was free to sell the property to the Lapucks upon Frostar's breach of its obligations under the purchase and sale agreement, see *Mucci* v. *Brockton Bocce Club, Inc.*, 19 Mass. App. Ct. at 160, is at odds with the jury's conclusion that Malloy, rather than Frostar, was the breaching party — a conclusion we have determined to be supported by the evidence.

verdict on Frostar's claim of breach of the purchase and sale agreement, the defendants contend that Malloy fully complied with his obligation under the agreement to furnish an environmental study of the property, and that the uncontroverted evidence established that Frostar did not comply with its obligations under the agreement and, in addition, failed to tender performance at the time designated in the agreement for closing. Finally, the defendants contend that the evidence compels judgment in their favor because, even if Frostar was relieved of the duty to tender performance in the circumstances, Frostar failed to establish that it was ready, willing, and able to perform its obligations under the agreement. As to breach of the implied covenant of good faith and fair dealing, the defendants argue that there is no evidence in the record to support a conclusion that Malloy acted in bad faith or with dishonest purpose, conscious wrongdoing, or ill will.

Frostar's claim that Malloy breached the purchase and sale agreement centers on its assertion that the environmental study Malloy furnished did not satisfy Malloy's obligations under the agreement on that subject. The agreement did not specify the nature and scope of the study Malloy was required to furnish; the jury accordingly could look to the circumstances of the negotiations between the parties to construe the meaning of the provision.[21] *Robert Indus., Inc.* v. *Spence*, 362 Mass. 751, 753-754 (1973). There was sufficient evidence for the jury to conclude that the parties contemplated that the study Malloy was to furnish would provide adequate information to allow Frostar to make an informed judgment concerning the risk that the property was contaminated by hazardous waste, that the study Malloy furnished failed to do so, and that Malloy consequently placed Frostar in the untenable position of having to decide whether to terminate the agreement (thereby sacrificing its right to purchase the property at the agreed price), or to

---

[21]In reply to the defendants' suggestion that the scope of the study was defined by the limitation under the agreement that Malloy was obliged to contribute no more than $2,000 to its cost, Frostar correctly observes that the limitation was on the extent of Malloy's contribution, and not on the total cost of the study.

close on the purchase without knowing the scope of the potential environmental liability it might incur by doing so.[22]

The jury further could have concluded, in the circumstances, where Malloy furnished the study to Frostar well after the period specified in the agreement, well after expiration of the period for the buyer's performance of its own inspections, and so near the closing date that the buyer was without any realistic ability to resolve before the scheduled closing date the uncertainty concerning the environmental condition of the property, that Malloy had an implied obligation to grant to Frostar a reasonable extension of time (as Frostar requested) to allow Frostar to perform its own, more thorough investigation. We conclude that there was adequate support in the evidence for the jury's conclusion that Malloy breached the purchase and sale agreement.

As to the claim of breach of the implied covenant of good faith and fair dealing, both Frostar and Malloy attempted at trial to portray the other as the party who sought for improper purpose to scuttle or delay the sale of the property, and there were facts in evidence to support either conclusion. The judge correctly recognized that resolution of that factual dispute is a quintessential jury function, and declined to accept the defendants' arguments for judgment notwithstanding the verdict to the extent they rested on the assertion that Malloy did not act in bad faith or for an improper purpose.

Our inquiry does not end, however, with our conclusion that the evidence sufficiently supported a jury finding that Malloy failed to discharge his obligations under both the contract and the implied covenant of good faith and fair dealing. "It is the general rule 'that when performance under a contract is concurrent, one party cannot put the other in default unless he is ready, able, and willing to perform and has manifested this by some offer of performance' although a tender of performance is not necessary 'if the other party has shown that he cannot or will not perform.' " *Kanavos* v. *Hancock Bank & Trust Co.,*

---

[22]Framing Frostar's position in that manner illustrates the flaw in the defendants' contention that Frostar's sole right under the agreement was to terminate if it was dissatisfied with the results of any inspection. The point is that Frostar bargained for, and was entitled to receive, an environmental report sufficient to allow an informed judgment whether to terminate or to proceed — or at least a jury could so have found.

395 Mass. 199, 202 (1985), quoting from *Mayer* v. *Boston Metropolitan Airport, Inc.*, 355 Mass. 344, 354 (1969).

In the present case, the jury could have found that Malloy steadfastly refused to furnish Frostar with an environmental study adequate in scope to permit Frostar to assess the environmental condition of the property. Because the environmental study Malloy furnished to Frostar did not permit Frostar to assess the environmental condition of the property, and because the date on which Malloy furnished the study — coupled with the delays in delivery of a fully-signed purchase and sale agreement and Malloy's refusal to allow Frostar an extension of time to perform its own study — frustrated Frostar's opportunity to obtain information independently to assess the environmental condition, we reject the defendants' contention that Frostar's claim is barred by its failure to tender performance on the designated closing date.[23] See *Vander Realty Co.* v. *Gabriel*, 334 Mass. 267, 271 (1956) (buyer relieved of tender where seller's failure to perform obligation precedent to buyer's obligation to purchase rendered seller unable to perform on date scheduled for closing). Compare *Lafayette Place Assocs.* v. *Boston Redev. Authy.*, 427 Mass. 509, 522-523 (1998), cert. denied, 525 U.S. 1177 (1999) (buyer not relieved of tender where parties shared responsibility under contract to obtain appraisal, and buyer failed to follow provisions of contract to resolve resulting uncertainties).

The situation is different, however, regarding the question of Frostar's readiness and ability to close. The question of Frostar's (and Maggio's) financial ability to pay the purchase price on or about the designated closing date was hotly contested at trial. For present purposes it is sufficient to observe that the evidence illustrates a sharply declining financial condition, conflicting evidence of the value of certain tangible but illiquid assets held by Maggio, and a sizable amount held in escrow for

---

[23]In the present case, though the parties' agreement allowed Frostar to conduct its own inspections, the obligation to furnish an environmental study was assigned to Malloy in the first instance. As we have observed, *supra*, the jury could have concluded that the study Malloy furnished did not fulfil his obligations under the agreement.

Maggio's account but unavailable to him until several months after the closing was to have occurred. In reply to the defendants' contention on appeal that the evidence did not establish that Frostar was ready, willing, and able to close, Frostar asserts simply that the jury resolved that question of fact in Frostar's favor. However, there is no basis on which we may adopt that assertion because the judge declined the defendants' request to instruct the jury that, in order to place Malloy in breach, Frostar was required to show that it was ready, willing, and able to perform.[24] The refusal to give the requested instruction was error. See *Kanavos* v. *Hancock Bank & Trust Co.*, 395 Mass. at 206. The requirement that a party claiming breach of contract establish its ability to perform as a condition to recovery rests on the straightforward principle that a party claiming deprivation of the benefit of a contract must show that it was in a position to obtain the benefit of the contract, but for the breach. See 9 Corbin, Contracts § 978, at 818 (interim ed. 2002). Because the jury were not properly instructed on an element essential to their verdict, a new trial is required.

c. *Damages.* Paragraph 17 of the purchase and sale agreement included a provision which stated that "[n]otwithstanding anything to the contrary contained herein under no circumstances shall Buyer be entitled to recover any damages, direct, consequential or otherwise." Both in their motion for judgment notwithstanding the verdict and in this appeal, the defendants argue that Frostar's express waiver of damages as a remedy bars the jury's damage award. In an otherwise vigorous opposition, both in the Superior Court and in this appeal, Frostar offers no argument why the waiver of damages provision should not be given effect. We agree with the defendants that the express contractual provision in the purchase and sale agreement waiving damages in all circumstances precludes the jury's

---

[24]In reply to the defendants' argument on this subject, Frostar points simply to the judge's instruction that, in order to recover for breach, Frostar "must establish [its] full and complete performance of all obligations under the contract." The cited charge plainly does not frame for the jury the question whether Frostar was ready, willing, and able to perform its obligations under the contract.

damage award.[25] See *Canal Elec.* Co. v. *Westinghouse Elec. Corp.*, 406 Mass. 369, 374-375 (1990). With damages eliminated, however, there is no basis for the defendants' contention that the judge abused her discretion in ordering specific performance as a remedy.

2. *Frostar's cross appeal.* Finally, we discern no error in the trial judge's ruling that Malloy's conduct did not violate G. L. c. 93A. Frostar's contention that the trial judge was bound by the jury's recommendation on the c. 93A claim is simply incorrect.[26] See, e.g., *Poly* v. *Moylan*, 423 Mass. 141, 151 (1996). The judge was entitled to take a different view of the evidence than that expressed in the jury's verdict and, as we have noted, the record furnished support for either view.[27]

3. *Conclusion.* So much of the judgment on count I of the complaint, which claimed a breach of the right of first refusal by the defendants, is reversed, and that claim will be dismissed. So much of the judgment on counts II and IV of the complaint, which claimed that Malloy breached the purchase and sale agreement and the implied covenant of good faith and fair dealing, respectively, is vacated, and the case is remanded for a new

---

[25]To the extent that, in denying the defendants' motion to set aside the damages award on that basis, the judge implicitly relied on the absence of a similar provision in the right of first refusal, our reversal of the judgment based on the right of first refusal eliminates that factor. The covenant of good faith and fair dealing is implied in the contract between the parties, viz., the purchase and sale agreement, and accordingly the parties remain subject to the waiver of damages contained in that agreement. See *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp.*, 441 Mass. at 385.

[26]As the defendants correctly observe, *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451 (1991), does not support the plaintiffs' assertion that the finding of a breach of the covenant of good faith and fair dealing compels a finding of a violation of G. L. c. 93A. In that case, the findings on the breach of the covenant of good faith and fair dealing were made by the trial judge in a jury-waived trial. *Id.* at 471-476. In the present case, the findings on the breach of the covenant of good faith and fair dealing were made by the jury, and the judge's conclusion that the evidence was sufficient to support the jury's verdict does not compel the judge to adopt the jury's conclusion as her own.

[27]In light of our determination that the judgments must be vacated pending retrial of the question whether Frostar was ready, willing, and able to perform its obligations under the purchase and sale agreement, we also conclude that the trial judge did not abuse her discretion in staying her order for specific performance pending this appeal.

trial on those two counts.[28] So much of the judgment dismissing count V of the complaint, which claimed that Malloy violated G. L. c. 93A, § 11, is affirmed.

*So ordered.*

---

[28]Unlike the circumstances in *Kanavos* v. *Hancock Bank & Trust Co.*, 395 Mass. at 206, where the retrial was limited to the question whether the plaintiff was ready, willing, and able to perform his obligations under the contract, the question of Frostar's ability to perform in the present case is interwoven with the question of precisely what the jury considered to be Malloy's breach. For example, as discussed above, depending on which view of the evidence the jury took, Frostar's readiness and capacity to perform might be tested either as of March 2, 1998 (the closing date specified in the contract), or as of March 16, 1998 (the date at the end of the two-week extension Frostar requested but was refused).