COHEN, J.
 

 We review the consolidated appeals of the trial court’s directed verdict and final judgment in case no. 5D08-802, together with the trial court’s posttrial order denying a motion for attorney’s fees in case no. 5D08-3884. Three Keys, Ltd., and the Corinne R. Muller Trust (collectively the “Participant”), appeal the entry of a directed verdict and final judgment in favor of Kennedy Funding, Inc., Kennedy Funding,
 
 *897
 
 LLC, and Anglo-American Financial, LLP (collectively the “Lead”), following a $5,345,000 jury verdict in favor of the Participant on its claims of breach of contract and breach of the covenant of good faith and fair dealing. The Lead cross-appeals the denial of its counterclaim seeking supplemental and equitable relief, as well as its request for additional interest before an amended certifícate of title issued. The Lead also appeals the trial court’s order denying its motion to determine entitlement to attorney’s fees and costs under the offer of judgment statute. We affirm in all respects.
 

 Background
 

 The Feinstein Family Partnership (“Feinstein”) owned a mixed-use development of regional impact in Ft. Myers, Florida (the “Colonial DRI”), which it developed with roads, street lights, and utility system infrastructure. The Colonial DRI included twenty-two saleable parcels of real estate, one out-parcel, and $5.4 million in impact fee credits (the “Property” or “Collateral”). In the wake of a foreclosure judgment in favor of the City, which funded the infrastructure development, Feinstein filed for bankruptcy protection under Chapter 11. To proceed with the project, Feinstein, using a loan from the Muller Trust, sought to free the project from the bankruptcy trustee by negotiating a settlement of the City’s judgment and then seeking a loan to pay off the City and the Muller Trust. Ultimately, the Lead and the Participant joined to loan Feinstein $16,128,210, secured by a note, mortgage, and security agreement on the Property. The mortgage granted the Lead and Participant, as lenders, a super-priority security interest above all of Fein-stein’s creditors, except for the Lee. County Tax Collector. To fund the loan, the Lead advanced $11 million, and the Participant advanced $5,128,210; their respective interests in the loan were 68.2% and 31.8%.
 

 Inter-Creditor Agreement
 

 In addition to executing the loan documents with Feinstein, the Lead and the Participant entered into an Inter-Creditor Agreement (“Agreement”) that defined their relationship as co-lenders. According to the Agreement, the Lead held the loan documents and was charged with prosecuting any necessary foreclosure action. If Feinstein defaulted, the Agreement required any monies recovered to first be applied to satisfy the Lead Debt,
 
 [1]
 
 and any remainder divided pro rata between the Lead and the Participant. The Agreement also required the parties to share all reasonable costs, fees, and expenses necessary to foreclose, preserve, or liquidate the Property according to their pro rata interests in the loan.
 

 Feinstein subsequently defaulted on the loan, and the Lead filed a foreclosure action. Feinstein’s earlier Chapter 11 bankruptcy was converted to Chapter 7. In addition to the foreclosure suit, the Property was also the subject of environmental litigation involving allegations that Fein-stein violated the Federal Clean Water Act. The Lead incurred considerable attorneys’ fees, consultants’ fees for environmental mitigation plans, and costs in defending and settling this litigation. Attorneys with Greenberg, Traurig, representing the Lead in the bankruptcy and foreclosure proceedings, agreed to indefi-'
 
 *898
 
 nitely defer payment of $200,000 in attorneys’ fees until the Lead recovered all monies due it under the loan. Additionally, Greenberg, Traurig capped all attorneys’ fees incurred after November 1, 1999, in the Feinstein matters at $100,000. The Lead did not inform the Participant about either of these agreements. Ultimately, the Lead paid the bankruptcy trustee $600,000 and the subordinate lenders a total of $217,500 to settle the foreclosure action and reach a stipulation for entry of a final judgment of foreclosure. This concluded the foreclosure action. The Lead also agreed to pay $1,198,400 for offsite environmental mitigation and $31,000 to grant a conservation easement on a small portion of the Property, for a total of $1,229,400 to settle the environmental litigation.
 

 On November 21, 2000, the circuit court entered a final judgment of foreclosure in favor of the Lead and determined $22,291,635.66 was owed, representing $16,128,210 in principal and accrued interest of $6,163,425.66. The final foreclosure judgment provided that the Property would be sold subject to the lien for unpaid real estate taxes, NationsBank’s first lien on the impact fee credits, and the claims arising out of the environmental litigation. The final judgment also reserved jurisdiction to award the Lead “additional sums for costs, attorney’s fees, real estate taxes, and other charges and expenses incurred in preserving its collateral or enforcing its rights under the mortgage documents.” Pursuant to their respective loan interests, the Lead’s share of the judgment was $15,202,895 or 68.2%, and the Participant’s share was $7,088,740 or 31.8%.
 

 At the foreclosure sale, Kennedy Funding, LLC, formed by the Lead to take title, purchased the Property with a credit bid. On January 4, 2001, the clerk issued a certificate of title vesting title to the Property in Kennedy Funding, LLC. As of that date, the Lead’s share of the foreclosure judgment plus postjudgment interest was $15,386,000, the final amount of Lead Debt which the Participant contended it was subordinated under the Agreement.
 

 When Kennedy Funding, LLC purchased the Property, there was approximately $2.5 to $3 million in unpaid real estate taxes, along with a host of other problems. The development approvals were about to expire and required renewal in order to develop the Property in accordance with the Colonial DRI. Further action was taken to obtain the City’s approval to amend some of the proposed uses to residential. There were also title problems and fines assessed by the City. The Lead paid attorneys’ fees, engineering fees, and other fees and costs to solve the problems, maintain, and market the Property.
 

 Issues regarding expense reimbursement arose early when the Lead demanded in November 1999 that the Participant reimburse the Lead for its share, or $193,369.87, of expenses totaling $608,157.87 allegedly due under the Agreement. The total expenses included the legal fees deferred by Greenberg, Traurig, as well as other amounts the Participant deemed unrelated. The Lead threatened to hold the Participant in default if it did not pay the expenses. Upon receiving this demand, Basciano, Three Keys’ principal, requested, but did not receive, supporting documentation for the expenses claimed.
 

 Disagreements also centered on the parties’ duty to consult regarding the liquidation of the Property. Based upon the description of the co-lenders’ rights and duties in section 6 of the Agreement, the Participant asserted that the Lead owed a duty to consult. The Agreement provides that the “Lead and Participant shall consult,” but in the case of disagreement,
 
 *899
 
 vested sole discretion in the Lead concerning the terms of any liquidation. Despite the language requiring the Lead consult with the Participant regarding the Property’s liquidation, the Lead refused to do so. The Lead contends that any failure to consult with the Participant was immaterial.
 

 The Lead’s original real estate broker was unsuccessful at selling any of the parcels during 2001 or 2002. Subsequently, the Lead hired CBRE, a national real estate brokerage firm, which ultimately succeeded in selling all of the Colonial DRI parcels. Despite repeated requests for sales information, appraisals, and listing agreements on the Property, almost four years passed before CBRE provided sales information to the Participant. Meanwhile, the Lead, reacting to the Participant’s continued demands for sales information, demanded the Participant pay its share of ever increasing expenses and declared that the Participant was in default for failing to pay $193,369.87 in expenses.
 

 Lawsuit
 

 Consequently, the Participant filed this lawsuit,
 
 [2]
 
 together with a lien on the Property, and the Lead counterclaimed, seeking damages for the Participant’s failure to pay its pro rata share of expenses.
 

 The Lead sold all the marketable impact fee credits without notice to the Participant and kept the proceeds. From February 2003 to September 2005, the Lead also sold the twenty-two parcels in the Colonial DRI without any significant input from, or consultation with, the Participant. By stipulation, the Participant released the lis pendens on the parcels in exchange for the Lead’s agreement to deposit the sales proceeds into an escrow account and that the release would not, in any way, prejudice or impair its claims against the Lead.
 

 Subsequently, the trial court granted the Lead’s motion for partial summary judgment and ordered that, with the exception of the Participant’s share of the impact fee credit sale proceeds, 68.2% of the escrowed proceeds be disbursed to the Lead and 68.2% of all future sales proceeds be disbursed directly to the Lead. Further, the trial court ordered that 31.8% of the deposited monies remain in escrow and that 31.8% of all future sales proceeds be deposited into the escrow account.
 

 In another pretrial partial summary judgment motion, the Lead claimed entitlement to a 100% reimbursement of $3,404,580, consisting of environmental mitigation expenses and unpaid property taxes before any sales proceeds were distributed to the Participant. Although declining to order immediate disbursement, the trial court ruled that the Lead was “entitled to reimbursement of amounts they paid for property taxes and mitigation credits from the proceeds from the sales of the Property prior to any payment to [the Participant], which amount will be determined at the conclusion of this case.”
 

 The ease was tried before a jury. The parties and trial court originally understood that the jury would decide the respective damages claims, and the trial court would make a posttrial determination on the Participant’s claim for declaratory relief regarding the proper distribution of the sales proceeds under the Agreement. During trial, the Lead made motions for directed verdict on the Participant’s breach of contract claim, which the
 
 *900
 
 trial court granted in part and reserved in part.
 

 The Participant’s breach of contract claim was based on two related breaches of the Agreement: the Lead’s refusal to consult with the Participant regarding the Property’s liquidation and the Lead’s breach of its implied covenant of good faith and fair dealing in liquidating the Property. The Participant introduced expert testimony that the Lead’s management of the parcels was grossly negligent. The Lead disputed the real estate appraiser’s opinion and concluded that he valued the commercial reasonableness of the sale of lots in a development context rather than from a liquidation perspective, as provided in the Inter-Creditor Agreement.
 

 On its claim, the Lead presented evidence that, after deducting $5,466,636 in expenses and an additional $15,385,270 for Lead Debt, no sales proceeds remained for distribution to the Participant. In fact, the Lead explained that under its formula for distributing the sales proceeds, the Participant owed $701,000 in expenses, representing the damages sought in the counterclaim. Central to the Lead’s argument was the trial court’s partial summary judgment ruling that the Lead was entitled to full reimbursement for $5,466,636 in property taxes and mitigation expenses from the sales proceeds before any distribution to the Participant.
 

 In contrast, the Participant’s proposed formula for distributing the sales proceeds first deducted Lead Debt of $15,386,000 from the gross sales proceeds of $24,047,000, to net $8,661,000 payable to the Participant. Then, the Participant subtracted its share of the total expenses incurred by the Lead, or $3,316,309, from the $8,661,000 for a net $5,344,691 payable to it. Not only did the Participant argue that it was not responsible for 100% of the Lead’s expenses, but it also contended that it suffered actual damages of $7,174,193, the total amount due it on the loan, as a result of the Lead’s breach of both its duty to consult and the implied covenant of good faith and fair dealing.
 

 Verdict and Posttrial Proceedings
 

 The jury returned a verdict for the Participant, finding that the Lead breached its duty to consult with the Participant regarding the Property’s liquidation, that it was a material breach, and, further, that the Lead breached its covenant of good faith and fair dealing in liquidating the Property. The jury awarded the Participant damages in the amount of $5,345,000. The jury also found that the Participant did not breach any duty to pay expenses under the Agreement and therefore awarded nothing to the Lead on its counterclaim.
 

 Following trial, the Lead filed a motion for judgment in accordance with a motion for directed verdict asserting that there was insufficient evidence to support the jury’s verdict on the Participant’s claim for breach of the Agreement. The Lead characterized the jury’s verdict as an improper declaratory judgment on the distribution of the sales proceeds. The Lead did not move for a directed verdict on its counterclaim or the Participant’s claim for declaratory relief. The trial court directed further briefing on whether the declaratory judgment claim was submitted to the jury, which resulted in additional posttrial motions.
 
 [3]
 

 
 *901
 
 After hearing extensive argument and considering additional motions and briefing, the trial court issued two orders that together granted the Lead a directed verdict on the Participant’s claim for breach of the Agreement and denied the Participant’s motion for final judgment. The trial court concluded that the June 2007 partial summary judgment order rejected the Participant’s argument against first subtracting environmental expenses and real estate taxes before distribution and declined to revisit the issue. It reaffirmed the partial summary judgment reimbursing the Lead in full for property taxes and mitigation expenses and ruled that the declaratory judgment claim was not submitted to the jury.
 

 Final Judgment
 

 On March 13, 2008, the trial court entered a final judgment for the Lead on the Participant’s breach of contract claim, rejected the Lead’s counterclaim, and declared the Lead was entitled to 100% of the sales proceeds on the Participant’s claim for declaratory relief. The trial court concluded, as a matter of law, that the Agreement granted the Lead sole discretion over the Property’s liquidation, even to the extent the Participant failed to recoup its investment. It reasoned that leaving the question to the jury would effectively rewrite the terms of the parties’ Agreement. This appeal ensued.
 

 Discussion
 

 Propriety of Directed Verdict
 

 “ ‘In considering a motion for directed verdict for the defendant, the court is required to evaluate the testimony in the light most favorable to the plaintiff, indulging every reasonable inference deduced from the evidence in the plaintiffs favor.’ ”
 
 Goolsby v. Qazi,
 
 847 So.2d 1001, 1002 (Fla. 5th DCA 2003)
 
 (quoting Cecile Resort Ltd. v. Hokanson,
 
 729 So.2d 446, 447 (Fla. 5th DCA 1999)). This is the standard used by the trial court as well as this court on appeal.
 
 Id.
 
 at 1003. If no view of the evidence could sustain a verdict for the nonmoving party, then the directed verdict was properly entered.
 
 Ritz v. Fla. Patient’s Comp. Fund,
 
 436 So.2d 987, 988 (Fla. 5th DCA 1983). A directed verdict should be granted only where there is no evidence upon which a jury could properly rely in finding for the plaintiff.
 
 Johnson v. Swerdzewski,
 
 935 So.2d 57, 60 (Fla. 1st DCA 2006). A motion for directed verdict “should be treated with special caution, and this is especially true in negligence cases, where the function of a jury to weigh and evaluate the evidence is particularly important since reasonable people can draw various conclusions from the same evidence.”
 
 Id.
 

 The Participant argues that the trial court erred in directing a verdict because it presented overwhelming evidence supporting the jury’s verdict on the factual question of whether the Lead breached both its duty to consult and the implied covenant of good faith and fair dealing in liquidating the Property. The Lead contends the Participant failed to prove that it did not consult, that any failure to consult was not a material breach of the Agreement, and, further, that it failed to meet the exceedingly high standard necessary to recover for breach of the implied covenant of good faith and fair dealing.
 

 The trial court, relying on
 
 Haiman v. Gundersheimer,
 
 130 Fla. 109, 177 So. 199 (1937), and
 
 Video Electronics, Inc. v. Tedder,
 
 470 So.2d 4 (Fla. 1st DCA 1985), ruled, as a matter of law, that any breach of the duty to consult, particularly where the Lead had sole discretion to dispose of the Property, was not material, thereby foreclosing any damages inquiry. Rejecting the Participant’s expert’s opinion of below market sales, the trial court conclud
 
 *902
 
 ed that the Participant failed to present any evidence that no other lender, under the circumstances of this case, would have acted similarly to the Lead. Consequently, the trial court found the Participant did not meet its burden of showing a breach of the implied covenant of good faith and fair dealing.
 

 Section 6 of the Agreement grants the Lead sole discretion in dealing with the Property and states in pertinent part:
 

 The parties acknowledge that if title to any such Collateral is obtained by the Lead, then the same will not be held as a permanent investment but will be liquidated as soon as practicable, taking into account current economic and market conditions. The Participant agrees that following the acquisition of the Collateral, or any part thereof, the Lead and the Participant shall consult in an effort to determine a mutually acceptable course of action relating to the Collateral;
 
 provided, however,
 
 if the parties cannot agree on a mutually acceptable course of action, the Lead shall take the course of action determined by Lead in its sole discretion, which may include the sale of the Collateral for whatever price and on whatever terms as may be determined by Lead in its sole discretion, notwithstanding the fact that the net proceeds received from any such sale may not be sufficient to repay fully the Lead and the Participant.
 

 The Participant acknowledges that the trial court correctly recognized that the implied covenant of good faith and fair dealing circumscribed the Lead’s “sole discretion” with an element of reasonableness.
 
 See Cox v. CSX Intermodal, Inc.,
 
 732 So.2d 1092 (Fla. 1st DCA 1999);
 
 Sepe v. City of Safety Harbor,
 
 761 So.2d 1182 (Fla. 2d DCA 2000). The Participant, nonetheless, questions the trial court’s use of the
 
 Sepe
 
 instruction,
 
 [4]
 
 contending the duty to consult was a condition precedent to the Lead exercising its sole discretion. Further, the failure of the condition precedent weakens the trial court’s conclusion that the duty to consult was not, as a matter of law, material because the parties acknowledged the possible inadequacy of the net proceeds to repay them.
 

 Although we acknowledge that the term “provided, however” in section 6 generally signals a condition,
 
 see Southern Colonization Co. v. Derfler,
 
 73 Fla. 924, 75 So. 790, 792 (1917), a thorough analysis of the Agreement’s overall terms shows this was not intended by the parties. The element of reasonableness in this case must be interpreted in conjunction with the sole discretion vested in the Lead to liquidate the Property. The Participant cites
 
 James v. James,
 
 843 So.2d 304 (Fla. 5th DCA 2003), and
 
 Frostar Corp. v. Malloy,
 
 63 Mass.App.Ct. 96, 823 N.E.2d 417 (2005), in arguing that the trial court erroneously directed the verdict. In
 
 Frostar,
 
 the alleged breach of an implied covenant of good faith and fair dealing was deemed a jury function, but in contrast, there was no sole discretion clause to interpret. In
 
 James,
 
 it was not disputed that the attorney-in-fact’s quitclaim deed transferring the decedent’s homestead to his children exceeded $10,000 per child permitted under the power of attorney and that he failed to consult with the Bank as required
 
 *903
 
 in the power prior to making gifts. Observing the general rule that an agent cannot make gifts of his principal’s property to himself or others unless it is expressly authorized and strictly construing the terms of the powers, this court held that the attorney-in-fact clearly exceeded his authority.
 
 James,
 
 843 So.2d at 308. There was no sole discretion vested in the attorney-in-fact and his authority was limited to make a gift “so long as the gifts were consistent ‘with prudent estate planning and financial management, and after consultation with Mellon Bank, N.A.’ ”
 
 Id.
 
 at 306.
 

 The purpose of the implied covenant of good faith is to protect the reasonable expectations of the contracting parties.
 
 Cox,
 
 732 So.2d at 1097. The covenant, however, is not a stated contractual term and, to operate, it attaches to the performance of a specific or express contractual provision.
 
 Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A.,
 
 896 So.2d 787, 792 (Fla. 2d DCA 2005). Further, the implied covenant of good faith cannot be used to vary the terms of an express contract.
 
 Beach Street Bikes, Inc. v. Bourgett's Bike Works, Inc.,
 
 900 So.2d 697, 700 (Fla. 5th DCA 2005). To view the duty to consult as a condition precedent would negate the overall intent of the parties.
 

 The trial court correctly concluded that the Participant presented no evidence that no reasonable party in the position of the Lead would have made the same discretionary decision that the Lead made. The Participant’s real estate appraiser testified to the property’s fair market value, but the trial court agreed with the Lead that the expert’s valuation fell outside the purpose expressed in the Agreement, which was not to develop the Property, but instead, to liquidate it.
 
 [5]
 
 The trial court concluded, therefore, as a matter of law, that no view of the evidence could sustain a verdict for the Participant and the directed verdict was properly entered.
 

 Declaratory judgment
 

 We agree with the trial court that the declaratory judgment claim was not determined by the jury. The jury was not instructed on the declaratory judgment, nor did the verdict form include special interrogatories pertinent to a finding of the parties’ entitlement to the sales proceeds under the Agreement.
 

 Although a declaratory judgment is accorded a presumption of correctness,
 
 Williams v. General Insurance Co.,
 
 468 So.2d 1033, 1034 (Fla. 3d DCA 1985), because the trial court’s decision rests on a question of law in interpreting the contract, the standard of review is de novo.
 
 See Reform Party of Fla. v. Black,
 
 885 So.2d 303, 310 (Fla.2004).
 

 The hallmark in the construction of a contract is the parties’ intent, and courts should ascertain such intention and effectuate it.
 
 St. Augustine Pools, Inc. v. James M. Barker, Inc.,
 
 687 So.2d 957, 958 (Fla. 5th DCA 1997). To determine the parties’ intent, “a court should consider the language in the contract, the subject matter of the contract, and the object and purpose of the contract.”
 
 Huntington on the Green Condo. v. Lemon Tree I-Condo.,
 
 874 So.2d 1, 4 (Fla. 5th DCA 2004). The interpretation of a contract is a question of law and, therefore, this court is not bound by the conclusions reached by the trial court in construing a contract. WSOS-
 
 FM, Inc. v. Hadden,
 
 951 So.2d 61, 63 (Fla. 5th DCA 2007). An interpretation giving a
 
 *904
 
 reasonable meaning to all provisions of a contract is preferred to one that renders part of the contract meaningless.
 
 Premier Ins. Co. v. Adams,
 
 632 So.2d 1054, 1057 (Fla. 5th DCA 1994). “A court is not empowered to rewrite a clear and unambiguous provision, nor should it attempt to make an otherwise valid contract more reasonable for one of the parties.”
 
 N. Am. Van Lines v. Collyer,
 
 616 So.2d 177, 179 (Fla. 5th DCA 1993).
 

 The Agreement defines the relationship between the Lead and the Participant in connection with their loan to Feinstein and incorporates the related promissory note. The note, mortgage and security agreement, guaranties, and all other documents and agreements relating to the loan are collectively referred to as the “Loan Documents.” Section 2, “Funding of Loan; Priority of Interest,” mandates that any payments the Lead receives from the Borrower be first applied to reduce Lead Debt. Further, “[a]t all times prior to the date on which Lead has been paid in full ... Participant’s right to receive repayment of its Advance ... is expressly subordinated and junior in right of payment to the prior payment and satisfaction in full in cash of Lead Debt....” By cross-referencing section 2 in section 6, “Acquisition of Title to Collateral,” the proceeds from any sale of collateral are treated the same.
 

 The parties agree that the principal and interest portion of Lead Debt is $15,385,270, but disagree whether other expenses for real estate taxes, attorneys’ fees, and environmental mitigation are characterized as Lead Debt and, therefore, deducted from the sales proceeds before distributing the Participant’s share.
 

 The Participant contends that the Lead has taken contradictory positions regarding the extent of the Participant’s obligations for expenses. After the Lead acquired title to the Property, it originally demanded the Participant pay 31.8% of the expenses incurred; at summary judgment and through trial, the Lead asserted that the Participant was obligated to pay a far greater sum before becoming entitled to a return of its advance. A comparison of the Participant’s obligations under sections 2, 5, and 6 resolves this contradiction. Section 2 applies to payments made by the Borrower, and, as discussed, requires the Participant to first repay all of the Lead Debt. Section 5 requires the Participant to promptly reimburse the Lead for its pro rata share of “all reasonable costs and expenses, including, without limitation, fees of receivers or trustees, court costs, filing and recording fees, appraiser’s fees and fees and expenses of counsel, incurred by Lead in connection -with its enforcement of any rights or remedies under the Loan Documents, regardless of whether Lead acquires title to any Collateral,” to the extent that such costs are not recovered from Borrower or other responsible entity. Section 6 comes into play once the Lead acquires title to any collateral and proceeds from the eventual sale and cross references section 2 with respect to proceeds from liquidation.
 

 We interpret section 5(b) of the Agreement to require the Participant to pay its pro rata 31.8% share of expenses regardless of whether the Borrower made any payments or the Lead ever acquired title to the Property. Alternatively, if the Lead received payments from the Borrower or proceeds from the sale of Property, sections 2 and 6 require the Lead Debt be repaid first before the Participant may receive repayment on its loan. Section 6 requires the Participant to pay its share of all reasonable costs of foreclosing, protecting, preserving, and/or liquidating the Property, and, by cross-referencing section 2, subjects the proceeds from any sale of Property to Participant’s payment of Lead Debt to trigger its right to receive repayment of its Advance. Thus, the Lead’s
 
 *905
 
 position on payment of expenses is not contradictory and expressed the intent of the Agreement.
 

 The trial court, in its order on various posttrial motions, found in favor of the Lead on the declaratory judgment claim and specifically found that the Agreement unambiguously provided that once the Property was obtained by the Lead, the Participant would be paid, if at all, from the “net proceeds” from any sale. The final judgment analyzes the interplay of the various provisions and concludes that the Lead must be paid in full first from the proceeds of the liquidation of Property before the Participant receives any money. The trial court concluded that the last sentence of section 6, providing that the proceeds of any Property are to be distributed in accordance with the provisions of section 2 of the Agreement, ties directly into the language of section 2(b), stating that “payments made by Borrower to Lead under the Note (including without limitation any payments received in respect of the sale of any Collateral), shall be disbursed hereunder as follows.” Under section 2(b), once an event of default occurs under the Loan documents, the “Participant’s rights shall be expressly subordinated and junior in right of payment” to that of the Lead. Therefore, the Lead’s expenses for taxes and environmental mitigation are properly deducted first from the proceeds before the Participant becomes entitled to repayment.
 

 We agree with the trial court’s interpretation of the Agreement and, therefore, affirm the declaratory judgment. Despite recognizing the harshness of the result, we, like the trial court, are not free to rewrite the terms of the Agreement.
 

 Cross-appeal
 

 Request for equitable and supplemental relief
 

 The Lead challenges the trial court’s denial of its request for equitable and supplemental relief in the form of statutory interest under section 55.03, Florida Statutes, on the sales proceeds deposited into the escrow account. This court reviews for an abuse of discretion the trial court’s denial of supplemental and equitable relief.
 
 See Friendship Park Prop. Corp. v. Shaw,
 
 505 So.2d 456, 457 (Fla. 1st DCA 1987).
 

 Further relief based on a declaratory judgment may be granted when necessary or proper. § 86.061, Fla. Stat. (2007). We cannot say that no reasonable person would take the view adopted by the trial court.
 
 See Canakaris v. Canakaris,
 
 382 So.2d 1197, 1203 (Fla.1980). Accordingly, we affirm the trial court’s ruling.
 

 Motion for attorneys’ fees under section 768.79, Florida Statutes
 

 The trial court denied the Lead’s request for attorneys’ fees based upon an offer of judgment conditioned upon a joint acceptance by both Three Keys and the Muller Trust. Based upon the Second District’s reasoning and conclusion in
 
 Attorneys’ Title Insurance Fund, Inc. v. Gorka,
 
 989 So.2d 1210, 1213-14 (Fla. 2d DCA 2008),
 
 rev. granted,
 
 10 So.3d 631 (Fla.2009), we agree with the trial court that the Lead’s proposal for settlement was invalid and unenforceable for the purpose of imposing fees against the Participant.
 

 Accordingly, we affirm the trial court’s final judgment in its entirety.
 

 AFFIRMED.
 

 SAWAYA, J., and HARRIS, C., Senior Judge, concur.
 

 [1]
 

 . The Agreement defines "Lead Debt" as "all indebtedness, liabilities and obligations now or at any time ... hereafter owing by Borrower to Lead under the Loan Documents ... whether for principal, interest, ... fees, costs or expenses ... and all other demands, claims, liabilities or causes of action for which Borrower may now or at any time ... hereafter in any way be liable to Lead under any of the Loan Documents.... ”
 

 [2]
 

 . The remaining counts tried by jury were the Participant's claims of breach of contract and breach of the covenant of good faith and fair dealing and the Lead's counterclaim for damages attributable to the Participant’s failure to pay its pro rata share of expenses. Also on appeal is the issue of whether the trial court submitted to the jury the Participant's claim for declaratory relief regarding the sales proceeds.
 

 [3]
 

 . The Participant filed a motion for entry of final judgment and subsequently an "amended motion for entry of final judgment based on the jury’s verdict on the evidence presented, or in the alternative, motion for summary judgment, or in the further alternative motion for clarification and rehearing." The Lead filed its own motion for final judgment requesting a declaration that it was entitled to all of the sales proceeds.
 

 [4]
 

 . The jury instruction on the covenant of good faith and fair dealing read:
 

 You are instructed that the Lead was authorized to act in its sole discretion under the Inter-Creditor Agreement. You are instructed that the implied duty of good faith and fair dealing means that the Lead could take any course of action relating to the Collateral (i.e., the Property) unless no reasonable party in the position of the Lead would have made the same discretionary decisions that the Lead made.
 

 [5]
 

 . Section 6 provides, in part: "The parties acknowledge that if title to any such Collateral is obtained by the Lead, then the same will not be held as a permanent investment but will be liquidated as soon as practicable, taking into account current economic and market conditions.”