# United States Court of Appeals
## For the First Circuit

---

No. 00-2032

KENNETH FISHMAN,
TRUSTEE OF ONE NEEDHAM PLACE REALTY TRUST,

Appellant,

v.

LaSALLE NATIONAL BANK,

Appellee.                                    .

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

---

Before

Boudin, Lynch and Lipez,

Circuit Judges.

---

Marshall F. Newman and Newman & Newman, P.C. on brief for appellant.
Larry W. Joye, Lori R. Schultz, Morrison & Hecker L.L.P., Kevin F. Moloney and Barron & Stadfeld, P.C. on brief for appellee.

---

April 26, 2001

---

BOUDIN, <u>Circuit Judge</u>.  This case was brought in the district court to interpret a note whose prepayment terms were poorly drafted.  The note, in the amount of $5.4 million for a period of years, was issued in 1991 by One Needham Place Realty Trust (the "borrower") to Confederation Life Insurance Company.  It is now owned by LaSalle National Bank (the "holder").  A loan agreement reflected in a loan commitment letter preceded the note.  The note was later modified but only to extend the term of the loan.

The note permitted prepayment but required the borrower to pay a "prepayment premium" for the privilege of early payment.  In 1998, the borrower sought to refinance the note to take advantage of lower prevailing interest rates, but the parties disagreed as to how to calculate the prepayment premium.  The note set the premium as the  greater of one percent of the outstanding principal balance or a "yield maintenance prepayment premium" computed in accordance with a formula.  The pertinent language follows:

> 3.  <u>Prepayment Privilege</u>.  Provided no default exists hereunder or under the Mortgage or any other document securing this Note, the Maker may prepay the full balance any time during term of the loan subject to giving not less than eighty-five (85) days prior written notice and to the payment of

-2-

"Prepayment Premium" which shall be the greater of (a) one percent (1%) of the outstanding principal balance of the Note, or (b) a Yield Maintenance Prepayment Premium computed as follows: The Yield Maintenance Prepayment Premium shall be an amount equal to the product of (i) the outstanding principal balance due hereunder (including accrued interest) at the time of prepayment multiplied by (ii) the "Monthly Interest Differential" (as hereinafter defined), and (iii) discounted by the "Treasury Yield" (as hereinafter defined) rate over the number of months then remaining to the end of the fifth Loan Year. The "Monthly Interest Payment Differential" equals one-twelfth (1/12) of the amount (if any) by which the annual interest rate payable hereunder at such time exceeds the Treasury Yield for the period of time commencing on the next following day and ending on the Maturity Date ("Remaining Term").

Taken literally, this formula could be read to fix the yield maintenance prepayment premium as the product of a single calculation applied to the then outstanding balance (here, $4,140,927). Alternatively, the language could be read to suggest a series of calculations determining the present value of what the lender would lose, given current interest rates, as a result of the prepayment. In this case, the figure produced by the first calculation was so modest ($11,514) that the result would not be greater than one percent of the balance; by contrast, the figure produced by the second was very substantial ($393,852).

-3-

Because the borrower urged the first interpretation and the holder advanced the second, the borrower brought this action in the district court to construe the note.  The district judge ruled on summary judgment that the second calculation was the proper reading of the note, even without considering the original commitment letter; that the borrower's reading would render certain of the terms superfluous; and that the commitment letter preceding the loan made clear with an example that the series of monthly calculations was intended.  The borrower now appeals.

We affirm essentially for the reasons given by the district judge in his able bench ruling but address briefly the claims made on this appeal.  Since the matter was resolved on summary judgment, our review is <u>de novo</u>.  Although the language of the note is confusing, the meaning of the prepayment terms taken as a whole is not ambiguous once the calculations themselves are fully understood.  In our view, the commitment letter merely underscores the correctness of the outcome.

The borrower argues at length that its reading is <u>the</u> literal one and it was therefore improper for the district court to adopt any other reading or resort to extrinsic evidence (which is, debatably, what the borrower calls the commitment

letter).[1]  But readings of documents do not automatically fall into two neat categories--literal and non-literal; often, as here, it is a matter of degree.  See Farnsworth, supra, § 7.8, at 498.  In this case, the borrower's reading is also awkward as to language (e.g., the references to the monthly figure), and the note owner's reading is not far from literal if one understands "monthly" to entail month-by-month calculations.

It is centrally important that the owner's reading makes sense--that is, it carries out what one might imagine to be a plausible objective of parties so situated and is consistent with the usage of trade.  See Baybank Middlesex v. 1200 Beacon Props., Inc., 760 F. Supp. 957, 966 n.8 (D. Mass. 1991).  By contrast, the borrower has written a brief strong on canons and doctrine but without explaining why contracting parties would ever select the calculation urged by the borrower. The presumption in commercial contracts is that the parties were trying to accomplish something rational.  See Shea v. Bay State

---

[1]If the note were deemed a complete integration of the bargain, then formally the commitment letter would be extrinsic and could be considered only to resolve an ambiguity, Tilo Roofing Co. v. Pellerin, 122 N.E.2d 460, 462 (Mass. 1954), although in practice the matter is a shade more complicated, Farnsworth, Contracts § 7.3, at 470-78 (2d ed. 1990).  The label is debatable here--a point we need not resolve--because the note itself says it is issued "pursuant to the terms" of the commitment letter, which the holder claims is a cross reference sufficient to incorporate the letter.

<u>Gas Co.</u>, 418 N.E.2d 597, 601-02 (Mass. 1981).  Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons.  <u>Fleet Nat'l Bank</u> v. <u>H & D Entm't, Inc.</u>, 96 F.3d 532, 538 (1st Cir. 1996), <u>cert. denied</u>, 520 U.S. 1155 (1997).

The reason why the holder's reading makes sense is that its reading is a simple allocation to the borrower--straightforward once the calculations are understood--of the risk that interest rates will fall.  Prepayment might still benefit the borrower:  it might get a below market rate on refinancing or simply have the cash to spare; but the lender (for whom the holder is the surrogate), having taken the risk that rates would rise, gets the benefit when instead they fall. If the borrower's alternative reading made practical sense, the case would be more difficult; but it does not.

Lastly, the borrower argues that, if the contract was sufficiently ambiguous to permit extrinsic evidence (<u>e.g.</u>, the commitment letter), then surely the matter should have gone to a jury.  There are here buried questions of some interest. Putting aside interesting choice of law questions as between state and federal law,[2] the usual doctrine is that the judge

---

[2]The parties here ignore the problem, which is impressively treated in <u>Copley Cement Co.</u> v. <u>Willis & Paul Group</u>, 983 F.2d 1435 (7th Cir. 1993) (Posner, J.).  On the Seventh Amendment

construes contracts, even in close cases, if only the words need be considered, Restatement (Second) of Contracts § 212 cmt. d (1981), and the jury does the job under instructions if evidentiary issues have to be resolved (e.g., what the parties said orally in making the contract), so long as the outcome is reasonably debatable. See Bourque v. FDIC, 42 F.3d 704, 708 (1st Cir. 1994).

Ours may be the intermediate case where extrinsic facts permissibly bear on interpretation but are not themselves disputed. Here, the borrower has failed to point to any specific issue of raw fact (e.g., what the parties said to each other in negotiations) that is disputed. Although some case law equates any use of extrinsic evidence with a jury trial, arguably the "better" view, which is also followed in Massachusetts, is that the judge should do the construing where extrinsic facts are not in dispute even if the outcome is reasonably debatable. See, e.g., Baker v. America's Mortgage Servicing, Inc., 58 F.3d 321, 326 (7th Cir. 1995); Atwood v. City of Boston, 37 N.E.2d 131, 134 (Mass. 1941). In any event, the outcome here is not reasonably debatable.

Affirmed.

---

aspect, see Byrd v. Blue Ridge Rural Electric Cooperative, Inc., 356 U.S. 525 (1958).