# United States Court of Appeals

## For the First Circuit

No. 08-2393

MARILYN KUNELIUS,

Plaintiff, Appellant,

v.

TOWN OF STOW; THE TRUST FOR PUBLIC LAND;
CRAIG A. MACDONNELL, in his individual capacity,

Defendants, Appellees,

A PARTNERSHIP OF UNKNOWN NAME BETWEEN
TOWN OF STOW AND THE TRUST FOR PUBLIC LAND,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Torruella, Lipez and Howard,
Circuit Judges.

Michael C. McLaughlin for appellant.
Richard A. Oetheimer, with whom Dahlia S. Fetouh and Goodwin
Procter LLP, were on brief, for appellees The Trust for Public Land
and Craig A. MacDonnell.
Deborah I. Ecker, with whom Deidre Brennan Regan and Brody,
Hardoon, Perkins & Kesten, LLP, were on brief for appellee Town of
Stow.

November 9, 2009

**HOWARD**, **Circuit Judge**.  Similar to other states, Massachusetts provides tax relief to landowners of agricultural, horticultural or forest land.  When such land is converted to other uses, the Commonwealth requires landowners to compensate their respective municipalities.  The compensation may be take the form of, for example, payment of a conveyance tax when the land is sold, or payment of roll-back taxes if the land otherwise ceases to qualify for preferential tax treatment.  In addition to these tax features, Massachusetts law also provides that once a landowner decides to sell the land for other than agricultural, horticultural, or as relevant here, forest uses, the municipality is entitled to a right of first refusal ("ROFR").  Mass. Gen. Laws ch. 61.  This ROFR provides the municipality with a 120-day period in which to meet a bona fide offer to purchase the land.  The municipality thus has the right but not the obligation to preserve salutary land uses by purchasing land that the landowner desires to sell, and the  landowner receives the compensation that a willing buyer in an arm's-length transaction is prepared to pay.

In this case, plaintiff-appellant Marilyn Kunelius accepted a bona fide offer to purchase a parcel of land, which included acreage that had been certified under Mass. Gen. Laws ch. 61 as forest land.  Pursuant to the statute, the Town of Stow chose to exercise its ROFR.  In addition, the Town assigned this right, as also permitted by the statute, to the Trust for Public Land

("TPL" or "Trust"), a nonprofit conservation organization. From the beginning, it was clear that a number of circumstances had to align in a precise constellation for the Trust and the Town to consummate the transaction. Despite potential difficulties with the transaction, the Town and TPL nevertheless went through with the assignment of the ROFR. The Trust's optimistic hopes for obtaining private philanthropy, state grants, and local zoning relief, however, were not fulfilled. As a result, the Town and the Trust failed to complete the transaction. In the interim, Kunelius's previous buyer chose to develop other land.

Conceding that it had breached its obligations under its contract with Kunelius, the Trust paid liquidated damages in the amount specified in the purchase and sale contract that had been negotiated between Kunelius and her original buyer. Kunelius, however, believing that she was entitled to significantly more, brought suit in the district court. The complaint sought several species of relief, including the invalidation of the liquidated damages clause, specific performance or full contract damages, remedies for the Town and Trust's breach of the covenant of good faith and fair dealing, relief under the business-to-business provisions of Chapter 93A, and relief under the Contracts Clause of the United States Constitution. On cross-motions for summary judgment, the district court granted summary judgment to all of the defendants: the Town, the Trust, an alleged partnership between

-3-

the Town and Trust, and Trust employee Craig MacDonnell.  Kunelius now appeals.

## I.  Background

By and large, the facts are not in dispute, but to the extent that they are, we recite them in the light most favorable to the non-moving party, here, the appellant.  See Essex Ins. Co. v. BloomSouth Flooring Corp., 562 F.3d 399, 401 (1st Cir. 2009); CoxCom, Inc. v. Chaffee, 536 F.3d 101, 108 (1st Cir. 2008).

### A.  The Original Transaction

Beginning in 2001, Kunelius sought to sell her horse farm located at 142 and 144 Red Acre Road in Stow, Massachusetts.  The land abuts two conservation areas, the Red Acre Woods conservation area and the Captain Sargent conservation area, and it sits atop the Town's largest aquifer.  The total land area of this parcel is approximately 50.67 acres, 42.1 acres of which had been designated as forest land since 1985, pursuant to Mass. Gen. Laws ch. 61 § 2. Upon the remainder of the parcel (approximately 8.57 acres) sit a main house and a caretaker's house, as well as the accouterments of a horse farm, including a paddock, barn, and other improvements.

In mid-2002, Kunelius entered into negotiations with Cohousing Resources LLC ("Cohousing"), a consulting company based in the state of Washington that assists local communities in forming and developing co-housing projects.  Co-housing projects like the one Cohousing contemplated here place an emphasis on open

space and communal living. Because Cohousing requires the groups on whose behalf it undertakes development to commit to a certain threshold level of funding before Cohousing becomes involved, Cohousing's projects have a relatively high probability of coming to fruition. Through extensive negotiation and personal contact, Kunelius, her attorney and her real estate agent came to trust Cohousing and its principal representative, Chris ScottHansen. As a result, Kunelius was comfortable offering terms to Cohousing that she may not have offered to another counterparty.

Cohousing's initial offer was for a purchase price of $1.1 million, with a deposit of $50,000 to be held in escrow pending closing. In this first signed offer, the only contingency was an evaluation of the property's suitability for the eventual construction of a thirty-unit development. The offer contained a provision that permitted the seller to select from a range of remedies in the event of the buyer's breach:

> Upon default by Buyer, Seller, at its sole option, may (i) retain the deposit as liquidated damages as its sole remedy, or (ii) repay the deposit to the Buyer and subsequently enforce this Agreement and pursue any and all remedies available at law or equity, including an action for specific performance and damages.

This offer was not accepted, and negotiations continued. Cohousing's next offer was for the same purchase price, but contemplated that Kunelius would provide substantial seller financing. In addition, the deposit amount was reduced to only

-5-

$10,000 up front and a payment of $1,500 per month thereafter. The record suggests that the monthly payment was to replace Kunelius's horse farm income, because her customers would likely look elsewhere to board their horses. After a period for the feasibility study, Kunelius was free to make use of the deposits.

This revised offer also specifically contemplated the probability that Cohousing would file an application for relief from local zoning requirements, invoking the streamlined approval process for affordable housing set forth in Chapter 40B of the Massachusetts General Laws. See Mass. Gen. Laws ch. 40B §§ 20-23. In view of the anticipated approval process, the time for closing on this offer was approximately two years.

At Kunelius's request, this revised offer, although written to include all of her property, contemplated the possibility that "a significant portion of the undeveloped land . . . not to exceed 42 acres may be encumbered by or deeded to the Town of Stow," and that this encumbrance or transfer was to occur after all 40B approvals had been made and before closing. The upshot of this feature was to allow Kunelius to receive any tax credit for the transfer or encumbrance.[1] Finally, the liquidated

---

[1]The record reflects that Kunelius intended to donate the 42.1 acres of forest land to the Town. We need not speculate about her reasons for structuring her affairs in the way that she did, rather than attempting to sell only the 8.57 acres in a transaction separate from the contemplated land donation. See Mass. Gen. Laws ch. 61 § 8 (2001) (providing that only land taxed under Chapter 61 is subject to the right of first refusal); see also Town of Sudbury

damages provision in Cohousing's revised offer remained the same as in the prior offer.

Although Kunelius did not accept the second offer, negotiations continued, and the parties eventually reached an agreement. The terms of the contract, which was drafted by Kunelius's attorney, diverged in several ways from previous offers. The slightly increased purchase price was to be paid in the same fashion as before, with Kunelius holding a note for a portion of the price. The time for performance was set at September 26, 2003, although Cohousing had the opportunity to extend this period for a year if "the Chap. 40B approval process is proceeding forward."

Among other changes were the inclusion of at least two references to the possibility of the Town exercising its ROFR. One provision stated flatly that "[i]n the event that the Town of Stow exercises its right of first refusal pursuant to Mass. Gen. Laws ch. 61, all monies deposited hereunder shall be forthwith returned to BUYER without further recourse by either party in equity or law." Another change involved a clarification of Kunelius's right to transfer that portion of her land classified as forest land: after the 40B development was approved and the seller received all

---

v. Scott, 787 N.E.2d 536, 542 & n.11 (Mass. 2003) (clarifying that Mass. Gen. Laws ch. 61A § 17 should be interpreted to allow "the municipality to exercise its first refusal rights as to the portion of the land that is to be separated from the remainder, when sold or converted, as set forth in [Mass. Gen. Laws ch. 61A § 14], while the remainder of the land may remain in c. 61A"(emphasis added)).

"purchase monies," the seller would transfer "all right, title, and interest in the said 42.1 acre parcel currently under [sic.] Mass. Gen. Laws ch. 61, as a charitable contribution."

For purposes of this action, however, the most important change between the prior offers and the signed contract was the clause specifying the remedies available to the seller in the event of the buyer's breach. The revised clause reads:

> If BUYER shall fail to fulfill the BUYER'S agreements herein, all deposits made hereunder by the BUYER shall be retained by the SELLER as liquidated damages and this shall constitute SELLER'S sole remedy in equity and law.

Both Kunelius and Cohousing signed this agreement sometime in October of 2002.

### B.  The Town Assigns Its ROFR to TPL

Within days of signing her agreement with Cohousing, Kunelius provided notice to the Town, and other parties required to be notified by statute, of her intent to sell all of her 50.67 acres. Spearheaded by a group known as the Friends of Red Acre ("FORA"), which included many of Kunelius's immediate neighbors on Red Acre Road, opposition to the proposed co-housing development sprouted quickly. This opposition eventually focused on alleged excess costs the Town would have to bear as the result of the co-housing development. Urging that the Town exercise its ROFR was one of the principal arrows in the opposition's quiver.

By December 2002, FORA proposed an alternative to the Cohousing's proposed development. The FORA plan provided that the Town would contribute $100,000 from Community Preservation Act funds and $300,000 from general town funds, as well as assign its ROFR to a non-profit conservation group. Additional funds would be raised by selling both homes on the property as affordable housing, and selling the horse farm operations to Eye of the Storm, a non-profit equine rescue organization. (These proposed sales contemplated relief from various zoning regulations). All of the remaining purchase price funding was to come through private donations.

The Trust for Public Land was identified as the non-profit conservation organization most likely to accept assignment of the Town's ROFR. TPL expressed a strong interest in accepting the assignment, but only if certain conditions were met. Those conditions included the Town's appropriating $400,000 to support the project, FORA and others raising the $22,000 in required deposits under Kunelius's contract with Cohousing, TPL determining that the project was feasible, and its governing board approving the assignment. On January 13, 2003, the Town decided to borrow and appropriate $305,000 from its general funds to support the Town's exercise of the ROFR. (The remaining $95,000 was to come from Community Preservation Act funds). But because the Town wished to exempt the borrowing from the limitations of Proposition

2 ½, see Mass. Gen. Laws ch. 59 § 21C, the vote was tentative, pending confirmation in a Special Town Election. By a vote of 515 to 355, however, Stow voters declined to approve the project.

Undaunted, FORA and the Trust pushed ahead and convinced the Town to extend consideration of the ROFR to the full 120-day period specified in the statute. During that time, Craig McDonnell, the TPL project manager for this transaction, prepared a lengthy "Project Fact Sheet" to brief TPL's governing board on the project and assist the board in arriving at a decision about how to proceed. In this document, McDonnell explained that Kunelius was planning to deed most of forest acres to the Town free of charge, but that TPL's involvement in the project would result in the conservation of three additional acres and provide the Town access to a pond on the 8.57 acres that Cohousing was planning to develop for fire suppression purposes.

As to the financing and risks of the proposal, McDonnell noted that with the failure of the appropriation, TPL would have to accept the assignment before the Town could replace the defeated $300,000 appropriation with additional Community Preservation Act funds, but that this risk was mitigated by the fact that he believed that TPL's exposure was limited to liquidated damages in the amount of $22,000, as provided in the contract between Kunelius and Cohousing. (Concomitantly, with this candid private assessment of TPL's obligations and exposure with respect to this transaction,

-10-

McDonnell publicly made disparaging statements about developers and touted TPL's commitment to complete the transaction and make Kunelius "whole.") McDonnell further noted that Kunelius was upset at the prospect of the Town assigning its ROFR to the Trust. He suggested, however, that the litigation risk was "minimal" due to the clarity of the liquidated damages clause, and he predicted that the Trust would prevail on summary judgment after minimal discovery in any suit brought by Kunelius. Eventually, TPL's governing board approved the acceptance of the assignment, but the board nonetheless withheld authority for TPL to close on the transaction.

Armed with this limited authority, McDonnell went ahead with efforts to acquire an assignment of the ROFR. Without disclosing to the Town the constraints placed on TPL, McDonnell negotiated with the Town's Board of Selectmen regarding the terms under which TPL would accept the assignment. By and large, the negotiations did not reflect significant disagreement between the Town and TPL, although TPL refused to indemnify the Town for potential damages or defense costs in the event of potential litigation. TPL did acknowledge that "the decided cases under Chapter 61 do not explicitly resolve all of the potential issues that arise when a municipality assigns its right of first refusal to a nonprofit conservation organization, including which terms of the underlying contract should obligate the assignee."

At a Board of Selectmen meeting on February 11, 2003,[2] days before the Town's ROFR was scheduled to lapse, the Town assigned the ROFR to the Trust on the terms described above. At the meeting, McDonnell gave a presentation describing the benefits of the transaction and urged approval of the assignment, but McDonnell did not disclose the conditions that the Trust's governing board placed on its acceptance of the assignment. By a vote of three to one, the Town's Board of Selectmen voted to assign the ROFR to the Trust, which the Trust accepted in writing the next day. In due course, Kunelius was provided with written notice that the Town had assigned the ROFR to the Trust, which provided notice of its acceptance.

C. The Transaction Sours

About a month later, by March 19, 2003, McDonnell was singing a different tune. On that date, McDonnell wrote in confidence to members of FORA, "I recently have spent some time thinking through this project in detail . . . and have a realized that a number of key assumptions about structure and timing are unworkable." In an attached confidential memorandum, McDonnell explained that the TPL would require $1.154 million at closing and

---

[2]The day before, on February 10, 2009, The Stow Community Preservation Committee, the body that administers Community Preservation Act Funds, heard a joint FORA/TPL plea to use funds to support the Trust's planned exercise of the ROFR. The Committee voted to recommend that the Town approve the necessary expenditures at the Town's annual meeting in May 2009.

proposed relying on Eye of the Storm, a fledgling non-profit with little infrastructure, to raise $400,000 either through fundraising or a loan secured by its interest in 144 Red Acre Road before closing. In addition, McDonnell contemplated raising $450,000 through private philanthropy prior to closing.

FORA agreed with these observations but concluded that McDonnell's proposed fund raising timetable was overly optimistic and urged the Trust to close with borrowed funds. To that end, FORA arranged for a line of credit for the Trust.

McDonnell replied with another confidential memorandum dated March 27, after the assignment but before the Town provided any funds. In this memorandum, for the first time, McDonnell disclosed to FORA that "TPL's national board has given only a tentative approval to this excellent adventure we are undertaking together. . . . We have not received the go-ahead to actually purchase the property. Our board is awaiting progress on both the political and fundraising fronts. Unless we secure approval at the May town meeting and make substantial progress on the remaining finances, I do not believe we will get national approval for this project."[3] Although McDonnell did not foreclose the possibility of TPL's obtaining "conservation financing," he made clear that it

---

[3]There is no indication in the record that these limitations on TPL's authority were disclosed to Kunelius or the Town at this time.

would have to be limited to $600,000, the combined value of the main house and the horse farm/caretaker's house.[4]

Despite these doubts with respect to the financing of the project, the Trust, FORA, and the Town pressed onward. The Trust and the Town applied for state aid to rehabilitate the two homes on the Kunelius property, and prepared for the Town meeting, which was to confirm the Town's contribution of Community Preservation Act funds. At the meeting, the funds were approved, but this approval marked the high-water mark of the potential transaction.

Soon thereafter, in mid-June 2003, although contrary indications were evident even before the Trust accepted the ROFR, it became clearer that the Trust's plan of dividing the parcel in order to sell the two homes on the Kunelius property was unlikely to fare well in the zoning process. In another blow to the project, in early July 2003, the State Department of Housing and Community Development denied the grant application to renovate the two houses on the property. The combination of these body blows forced the Trust to ramp up planning for abandoning the transaction, and to that end, McDonnell wrote to TPL colleagues "I think the most important thing about the 'exit strategy' is not to

_____

[4]In April 2003, McDonnell represented to the Massachusetts Department of Housing and Community Development that TPL had access to a six million dollar line of credit from a bank and would consider using this resource, even though internal TPL discussions suggested that TPL's governing board was unlikely to approve the use of financing in this project.

-14-

be seen as TPL pulling the plug, but for a consensus to emerge from all that the project has now got some fatal flaws . . . ."

The prediction of fatal flaws proved prescient, though some of them were of TPL's own making. Peter Christiansen, a leader of FORA, wrote that McDonnell's conduct led him to "feel raped," and that McDonnell had told him that TPL would neither engage in any fundraising nor supply any fundraising prospects. Christiansen further claimed that the Trust solicited leads that FORA members had identified for funding of other projects. This alleged poaching, combined with TPL's threats to pull out of the purchase altogether, made it difficult for FORA members to harness their relationships with potential donors. Once it appeared likely that TPL would withdraw from the transaction, that appearance would bode ill for FORA-members' relationships with repeat players in the conservation world.

By July 31, 2003, the Trust informed FORA that it was "not particularly sanguine" that the transaction could close. Indeed, TPL unequivocally stated that only price concessions from Kunelius, who was forced to deal with TPL by virtue of the ROFR, could save the transaction.[5] TPL then requested $350,000 in price concessions from Kunelius, which she refused. Although TPL and FORA continued to trade arguments about the feasibility of

_____

[5]At this time, TPL received discouraging news on the zoning front: outside counsel advised TPL that approval of the variances was extremely unlikely.

-15-

financing, the project was effectively dead. TPL unilaterally withdrew its application for a zoning variance on September 25, 2003, and did not close on September 26, 2003.

### D. Proceedings Below

Although further discussions occurred between TPL and Kunelius (sometimes with the facilitation of Town officials), resolution proved elusive. Kunelius filed the present suit against the Town, the Trust, an alleged partnership between the Town and Trust, and McDonnell in his individual capacity.[6] After preliminary skirmishing, including the dismissal of one count not at issue here, and after the conclusion of discovery, the district court granted summary judgment to all defendants.[7] This appeal timely followed.

## II. Discussion

We review summary judgment rulings de novo, and the presence of cross-motions for summary judgment does not alter or

---

[6]On appeal, Kunelius has not advanced any developed argument in support of her claims against McDonnell in his personal capacity, and therefore those arguments have been waived. Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 85 n.4 (1st Cir. 2006)

[7]We note that during the pendency of discovery, all defendants jointly filed a motion to certify a central question of this suit to the Massachusetts Supreme Judicial Court. The defendants argued that "there is no controlling precedent in the decisions of the SJC or the Massachusetts Appeals Court" regarding whether a liquidated damages clause negotiated between the owner of Chapter 61 lands and a willing buyer should, by operation of law, become a provision that is applicable to a municipality or non-profit conservation organization exercising an ROFR. This motion was eventually withdrawn, subject to renewal.

dilute this standard.  <u>Desrosiers</u> v. <u>Hartford Life and Accident</u> <u>Ins. Co.</u>, 515 F.3d 87, 92 (1st Cir. 2008).  We will affirm entry of summary judgment if the record -- viewed in the light most favorable to the nonmoving party, including all reasonable inferences drawn in favor of the nonmoving party -- discloses no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  <u>Arroyo-Audifred</u> v. <u>Verizon Wireless,</u> <u>Inc.</u>, 527 F.3d 215, 218 (1st Cir. 2008).

        We apply the substantive law of the forum state, here Massachusetts, to claims invoking the court's diversity jurisdiction, <u>see</u> <u>Citibank Global Mkts., Inc.</u> v. <u>Rodriguez-Santana</u>, 573 F.3d 17, 23 (1st Cir. 2009) (citing <u>Erie R.R. Co.</u> v. <u>Tompkins</u>, 304 U.S. 64, 78 (1938)), but we of course apply federal law to the federal claims.  Where no authoritative decision from the state court of last resort resolves an issue of state substantive law, we must predict, as best as we can, that court's resolution of the issue before us.  <u>Essex Ins. Co.</u>, 562 F.3d at 404 (citation omitted).  Although we have no single Polaris to guide our prediction of the state court's resolution of such questions, we rely on analogous cases decided in the forum state, persuasive reasoning in cases from other states, and other secondary sources, such as Restatements and treatises.  <u>Id.</u> (citing <u>Trans-Spec Truck</u> <u>Serv.</u> v. <u>Caterpillar Inc.</u>, 524 F.3d 315, 323 (1st Cir.), <u>cert.</u> <u>denied</u>, 129 S. Ct. 500 (2008)).

We will first discuss the appellant's claims that the original contract's liquidated damages provision does not apply to the Town or to TPL, and that the liquidated damages clause is in any event invalid. After that, we will address the Chapter 93A claim, the claim based on the covenant of good faith and fair dealing. Finally, we will briefly discuss Kunelius's remaining claims.

## A. Applicability of the Liquidated Damages Clause to the Town and Trust

We begin with the question of whether the liquidated damages clause in Kunelius's contract with Cohousing is a term that inures to the benefit of the Trust and the Town. The district court noted that all parties agree that TPL breached the purchase and sale contract, but they disagree as to the proper remedy. Kunelius sought specific performance or full benefit-of-the-bargain damages, while the Trust claimed that Kunelius's remedy for breach was limited to the $19,000 in deposits and monthly payments that it had already paid and Kunelius has retained.

The district court observed, as the parties had, that it is unclear whether Massachusetts courts would find that an exercise of an ROFR requires the purchaser to "literally meet every last detail of the prior offer or only the essential terms, such as, for instance, the identity of the subject property, the price, the time for performance and the like, but not subsidiary agreements, such

as, for instance, mortgage contingencies, rights to inspect . . . or pertinent to this controversy, provisions regarding remedies for breach."  Kunelius v. Town of Stow, No. 05-11697-GAO, 2008 WL 4372752 at *2 (D. Mass. Sept. 23, 2008) (footnote omitted).  The district court determined that it did not need to answer this question because the parties agreed that the purchase and sale agreement "set[] forth the terms of their contract."  As evidence of this agreement on the part of plaintiff, the district court cited paragraph 58 of her complaint which states, "The P & S is a valid and enforceable contract between Kunelius and Stow and TPL." Id.

Unlike the district court, we are not persuaded that Kunelius has admitted that the liquidated damages provision applied to the Town and the Trust.  Paragraph 55 of her complaint specifically states that "The obligations of Stow and TPL under Mass. Gen. Laws ch. 61 could not be avoided by relying on the liquidated damage[s] clause . . . since such liquidated damage[s] clause . . . was applicable only to Cohousing since it sought certain permits and approvals in connection with its [Chapter] 40B . . . Development."  (emphasis added).  In light of this paragraph, we think that the complaint is best read as asserting that the Town and the Trust's joint exercise of the ROFR, by operation of law, obliged them to purchase the property identified in the contract at the price stated.

-19-

The district court is, of course, correct that the Trust has consistently taken the position that it assumed the role of Cohousing in the contract and that the liquidated damages provision inured to its benefit. The plaintiff, however, claims that through her then-counsel, she communicated to the Town attorney her belief that the liquidated damages clause did not apply to the Town and the Trust. Moreover, the record also reveals that the Trust, in a communication to the Town, acknowledged that the question of which provisions of the P & S apply to the exercisor or assignee of an ROFR under Chapter 61 remains an open question. Ultimately, therefore, we are satisfied that the plaintiff adequately preserved this question below, and has properly raised it on appeal.

Ordinarily, in Massachusetts "contract interpretation is for the court, unless disputed issues of fact bear upon the interpretation of ambiguous language." Liberty Mut. Ins. Co. v. Greenwich Ins. Co., 417 F.3d 193, 197 (1st Cir. 2005) (citing Fishman v. LaSalle Nat'l Bank, 247 F.3d 300, 303 (1st Cir. 2001)). We have explained that "judges construe contracts, if only the words need be considered, and the jury does the job under instructions if evidentiary issues have to be resolved." Fishman, 237 F.3d at 303 (citations omitted). Here, there are no evidentiary questions to resolve; rather, we must decide, as a matter of law, whether the liquidated damages provision, by operation of law, was made applicable to the Town and the Trust.

For the reasons that follow, we believe that the Supreme Judicial Court ("SJC") would hold that the liquidated damages provision inures to the benefit of the Trust and the Town. Although there is scant case law interpreting Mass. Gen. Laws ch. 61 § 8, we may look to case law decided under the nearly identically-worded ROFR provision of agricultural and horticultural lands, Mass. Gen. Laws ch. 61A § 14. See Comm. v. Smith, 728 N.E.2d 272, 276 (Mass. 2000) (noting that it is most appropriate to use construction of one statute to inform construction of another when the two statutes relate to the same class of things or share a similar purpose) (citation omitted).

At the time that Kunelius entered into the transaction with Cohousing, the SJC had not decided any cases under either statute, but that court has since decided at least two cases under ch. 61A § 14. In Town of Sudbury v. Scott, a divided SJC, after reviewing the various features of Chapter 61A, including the conveyance tax, the roll-back tax, and the ROFR, held that in order for parties to the sale of lands certified under Chapter 61A to avoid a municipality's ROFR, the putative purchaser must not have the intent to convert the land to non-agricultural or non-horticultural purposes at the time of purchase. 787 N.E.2d at 544. The court therefore vacated summary judgment in favor of the purchaser and remanded the case for a determination of the purchaser's intent at the time of the purchase. Id. at 546-47. In

-21-

Town of Franklin v. Wyllie, a unanimous SJC held that a developer's offer to purchase undeveloped land subject to Chapter 61A was bona fide, even though the final purchase price was contingent on the number of lots ultimately approved for development.  819 N.E.2d 943, 948 (Mass. 2005).  The court went on to conclude that since the offer was bona fide, had the Town of Franklin chosen to exercise its ROFR it would have been obliged to determine how many lots would be approved for development to fix the purchase price, in order to purchase the property "on substantially the same terms and conditions" as those struck between the non-municipal buyer and the seller.  Id. at 950 (citing Stone v. W.E. Aubuchon Co., 562 N.E.2d 852 (Mass. App. Ct. 1990)).[8]

---

[8]The Massachusetts legislature has since abrogated the rule in Wyllie, and Mass. Gen. Laws ch. 61A § 14 and C. 61 §8 now require that in order to be "bona fide," an offer must not be "dependent on potential changes to current zoning or conditions or contingencies relating to the potential for or the potential extent of subdivision of the property for residential use or the potential for, or the potential extent of development of the property for industrial or commercial use, made by a party unaffiliated with the landowner for fixed consideration payable upon delivery of the deed."  St. 2006 C. 394 §§ 18, 31.

We apply the law as it was before the legislature amended it, effective March 22, 2007.  See Fleet Nat'l Bank v. Comm'r of Revenue, 852 N.E.2d 22, 28-29 (Mass. 2007) (noting that retroactive application of statutes adjusting substantive rights, as opposed to remedies, is disfavored and thus the court employs a presumption against retroactive application that it uses to resolve uncertain cases)(citing Austin v. Boston Univ. Hosp., 363 N.E.2d 515 (Mass. 1977)); see also City of Newburyport v. Woodman, No. 309692, 2007 WL 3256964, at *3-4 (Mass. Land Ct. 2007) (noting that General Court enacted C. 394 to overturn the decision in Wyllie, but that this enactment was not to be applied retroactively).

Thus, neither Scott nor Wyllie addresses the precise question at issue here. Nevertheless, the appellees make much of the fact that in both decisions the SJC suggested more broadly that the statutory ROFR conferred on a municipality under C. 61A § 14 and C. 61 § 8 "ripen[s] into an option to purchase according to the terms of the offer." Wyllie, 819 N.E.2d at 949 (citing Greenfield Country Estates Tenants Ass'n v. Deep, 666 N.E.2d 988, 993 n.14 (Mass. 1989)); see also Wyllie, 819 N.E.2d at 949 ("There is no indication, however, that the Legislature intended that a municipality's 'first refusal option' to purchase would encompass the right to purchase such land on different terms and conditions than [those] set forth in the 'bona fide offer.'" (emphasis added) (citing Scott, 787 N.E.2d at 544 n. 14))). From this language, the appellees argue that they should be obliged to take on no more risk or offer no more certainty that their transaction would close than Cohousing offered in its bona fide offer.

The plaintiff's position is that she was able to offer a streamlined liquidated damages clause to Cohousing because she had established a considerable amount of mutual trust and understanding with ScottHansen, and because she felt comfortable that Cohousing's development was properly financed and Chapter 40B approvals would be forthcoming. Consequently, the argument goes, it would be grossly unfair to give the Town and the Trust these same concessions, particularly in light of the fact that the Trust's

ability to close was tenuous from the beginning and its statements to the contrary were disingenuous. Embedded in this argument is the policy concern that granting municipalities and nonprofits added leverage to disrupt transactions involving certified land would tilt the statutory structure too far toward the municipality and would therefore reduce the number of landowners willing to participate in the scheme.

These arguments are not without some appeal, although the most obvious response is that Kunelius understood herself to be bargaining in the shadow of the Town's ROFR. She therefore also should have understood the desirability of accounting for the fact that any deal she struck would be available to the Town, or to any non-profit conservation organization to which the Town might choose to assign the lease. She may well have been able to negotiate terms that would have better protected her in the event that less reliable counterparties, such as the Town and the Trust, would become parties to this transaction. Whether or not such terms ultimately would have protected her, we must decide the case on the facts as they are. Despite her knowledge that the ROFR lurked in the weeds, Kunelius in fact did not include any language in the contract to limit her risk in the event of the exercise of the known ROFR.

In addition to Kunelius's control over the drafting of her contract, the cases at common law (which applies to statutory

ROFRs, see Scott, 787 N.E.2d at 543 n.12), cut against her legal position. Most common law courts do not appear to have focused carefully on this question, and thus have not addressed the specific concerns that the appellant identifies, but most have generally stated that once a seller receives a bona fide offer, the ROFR ripens into an option to purchase the property "at the price and otherwise on the terms stated in the offer." T.W. Nickerson, Inc. v. Fleet Nat. Bank, 898 N.E.2d 868, 878 (Mass. App. Ct. 2009) (quoting Frostar Corp. v. Malloy, 823 N.E.2d 417 (Mass. App. Ct. 2005) (emphasis added)); see also Gleason v. Norwest Mortgage, Inc., 243 F.3d 130, 139 n. 5 (3d Cir. 2001) (applying Minnesota law) (citing Allison v. Agribank FCB, 949 S.W.2d 182, 186 (Mo. Ct. App. 1997)); Henry Simons Lumber Co v. Simons, 44 N.W.2d 726, 727 (Minn. 1950). As a result, the holder of an ROFR must have knowledge of the terms and conditions of the entire offer so that the holder may decide if she wishes to meet the offer. T.W. Nickerson, 898 N.E.2d at 878 (citing Gyurkey v. Babler, 651 P.2d 928 (Idaho 1982)); see also Uno Rest., Inc. v. Boston Kenmore Realty Corp., 805 N.E.2d 957, 962-63 (Mass. 2004); Miller v. LeSea Broadcasting, Inc., 87 F.3d 224, (7th Cir. 1996) (applying Wisconsin law) (noting that requirement that holder of ROFR exactly match a bona fide offer is in fact a protection for the grantor of the ROFR). Requiring that the holder of an ROFR have access to

such terms would serve little purpose if the holder of the ROFR were not required to meet them.

Thus, the decisions interpreting the statutory ROFR at issue in this case (or more precisely, its twin), as well as decisions dealing with common law rights of first refusal more generally, all suggest that the holder of an ROFR must meet all of the terms and conditions of the offer, including subsidiary terms such as the liquidated damages clause at issue here. Many courts do, however, make an exception for immaterial terms with which the holder of an ROFR need not comply,[9] e.g., W. Tex. Transmission, L.P. v. Enron Corp., 907 F.2d 1554, 1556 (5th Cir. 1990); John D. Stump & Assocs., Inc. v. Cunningham Mem'l Park Inc., 419 S.E.2d 699, 705 (W. Va. 1992); Brownies Creek Collieries, Inc. v. Asher Coal Mining Co., 417 S.W.2d 249, 252 (Ky. 1967), and even those that do not make a materiality exception generally make three exceptions to the rule of exact matching. First, the grantor can waive exact matching by agreeing that certain terms should not apply to the holder of an ROFR. Miller, 87 F.3d at 227; see also State Dept. of Transp. v. Providence and Worcester R.R. Co., 674 A.2d 1239, 1243-44 (R.I. 1996) (state, acting pursuant to a statutory ROFR, did not void the ROFR by pointing out that seller

_____

[9]Alternatively, these courts permit the exercise of an ROFR even if there are insubstantial variations between the bona fide offer and the holder of the ROFR's offer, which is essentially the same thing. See Miller, 87 F.3d at 226.

-26-

was not required to undertake onerous action that would have been required had the bona fide offer been accepted). Second, it is of course clear that the names of the parties will not exactly match the proper names contained in the bona fide offer when the holder of an ROFR exercises it. Miller, 87 F.3d at 227; Providence and Worcester R.R. Co., 674 A.2d at 1243-44 (noting that name of buyer should be changed to "the state"). Finally, courts will relax the rule of perfect matching in the presence of bad faith. Wyllie, 819 N.E.2d at 949 n. 8; Miller, 87 F.3d at 228 (citing Or. RSA No.6, Inc. v. Castle Rock Cellular of Or., L.P., 76 F.3d 1003, 1007 (9th Cir. 1996)). Aside from these exceptions, however, most courts hold that the terms of the bona fide offer become binding on the holder of an ROFR. This authority persuades us that the SJC likely would adopt a similar rule.

In an argument faintly reminiscent of the third exception noted above, the appellant asserts that the Trust acted in bad faith such that the Trust should not be entitled to rely on the liquidated damages provision. As examples of that bad faith, the appellant points to the Trust's unwillingness to allow her to make a charitable donation of the 42.1 acres, its refusal to proceed under Chapter 40B, and its attempt to lower the purchase price. While declining to proceed with a Chapter 40B application was entirely proper, the Trust's other actions may suggest the possibility of a violation of Chapter 93A, a breach of the implied

-27-

covenant of good faith and fair dealing, or the Trust's anticipatory breach of its contract with the appellant (the first two of which we address later, and the last being a cause of action that has not found much hospitality under Massachusetts law, see generally Daniels v. Newton, 114 Mass. 530 (1874)).  We fail to see, however, in what way these action support an argument for varying the terms under which the Trust could accept the contract. Accordingly, this argument does not disturb our conclusion that the liquidated damages provision applies to the Trust and the Town.

B.  Validity of the Liquidated Damages Provision

Having determined that the liquidated damages provision of Kunelius's contract with Cohousing formed a part of her relationship with the Town and the Trust, we turn to her argument that the provision is nevertheless invalid.  In Massachusetts, whether a liquidated damages clause is valid and enforceable is a question of law, and therefore we review the issue de novo.  NPS LLC v. Minihane, 886 N.E.2d 670, 673 & n.5 (Mass. 2008).  Although it was once unsettled, it is now clear that in Massachusetts, the party resisting the enforcement of the liquidated damages provision bears the burden of persuasion.  Id. (citing TAL Fin. Corp. v. CSC Consulting, Inc., 844 N.E.2d 1085, 1092 (Mass. 2006)); see also Honey Dew Assocs., Inc. v. M&K Food Corp., 241 F.3d 23, 27 (1st Cir. 2001).

Massachusetts courts have long accepted contracts with liquidated damages provisions, particularly those involved in the purchase and sale of real estate. Kelly v. Marx, 705 N.E.2d 1114, 1116 (Mass. 1999). Generally, a contract containing a provision awarding liquidated damages to the seller of real property in the event of a buyer's breach will be enforced so long as "at the time the agreement was made, potential damages were difficult to determine and the [liquidated damages provision] was a reasonable forecast of damages expected to occur." Perroncello v. Donahue, 859 N.E.2d 827, 831 (Mass. 2007) (quoting Kelly, 705 N.E.2d at 1115). Under this rubric, Massachusetts courts have specifically eschewed the "second look" approach and evaluate both of these factors only at the time of contract formation. Kelly, 705 N.E.2d at 1116. Nevertheless, liquidated damages clauses will not be enforced if they provide for an amount that is "'grossly disproportionate to a reasonable estimate of actual damages' made at the time of contract formation." Id. (quoting Lynch v. Andrew, 481 N.E.2d 1383, 1386 (Mass. App. Ct. 1985).

Interestingly, most cases challenging liquidated damages provisions do so on the theory that overly large liquidated damage awards impermissibly function as a penalty.[10] See, e.g., NPS LLC,

_____

[10]There are good reasons to wonder whether worrying about whether liquidated damages take on a penal aspect is wise as a matter of contract law or economic policy. See generally, Charles J. Goetz and Robert E. Scott, Liquidated Damages, Penalties, and the Just Compensation Principle, 77 Colum. L. Rev. 554, 556 (1977)

886 N.E.2d at 673. In this case, the appellant complains that the liquidated damages provision was inadequate because it vastly underestimated her damages and therefore functions as a penalty against her.[11]

This theory is relatively novel, and the weight of authority is against it. E.g., Margaret H. Wayne Trust v. Lipsky, 846 P.2d 904, 910 (Idaho 1993); Mahoney v. Tingley, 529 P.2d 1068, 1070-71 (Wash. 1975) ("Except where extraordinary circumstances are involved such as fraud or serious overreaching by the purchaser, a seller who chooses to utilize the device of liquidated damages in an earnest money agreement . . . cannot avoid the effect of that agreement."); see also Nasco Inc. v. Pub. Storage, Inc., No. 92-CV-12731-RCL, 1995 WL 337072 (D. Mass. May 20, 1995). Nevertheless, it appears that in Kelly, and the cases decided thereafter, the SJC has left open the possibility that a liquidated damages clause will be set aside if it grossly overestimated or underestimated a

---

(arguing that uncritical application of the penalty doctrine "frequently induces a costly reexamination of the initial allocation of risks and may also deny the non-breaching party either adequate compensation for the harm caused by the breach or the opportunity to insure more optimally against such harm").

[11]In this regard, we note that the record suggests that the current, less favorable liquidated damages provision was not included among Cohousing's original offers but was made a part of the agreement that Kunelius's attorney ultimately drafted. While this fact is not dispositive of her claim, it is clear that the appellant was not stuck with this clause as the result of an adhesion contract, and the record further suggests that the appellant did not arrive at this particular clause due to a substantial inequality in bargaining power.

party's damages at the time of contract formation.  See Kelly, 705 N.E.2d at 1116 (liquidated damages provision will not be enforced if it provides for an amount "grossly disproportionate to a reasonable damages made at the time of contract formation"); Howard v. Wee, 811 N.E.2d 1050, 1052 (Mass. App. Ct. 2004) (noting that $1,000 in liquidated damages was not "unreasonably low," but not questioning that unreasonably low liquidated damages can be set aside under Kelly).

We must therefore determine whether the liquidated damages provision at issue in this case was, as a matter of law, grossly disproportionate to a reasonable estimate of the damages Kunelius would incur in the event that the sale of her $1.16 million property was not successful.[12]  Massachusetts courts have held that an earnest money deposit of 5% of the purchase price in a contract for the purchase and sale of real estate is reasonable as a matter law.  Kelly, 705 N.E.2d at 1117; see also NRT New England, Inc. v. Moncure, 24 Mass. L. Rptr. 599, 2008 WL 4739794, at *5 (Mass. Super. 2008); Old Oxford Realty Partners LLC v. Shea, No. 305754, 2005 WL 1323110, at *5 (Mass Land Ct. 2005).  Although we have found one reported decision in which a Massachusetts court

_____

[12]In order to uphold the liquidated damages provision, we also need to conclude that Kunelius's damages were difficult to measure at the time of contract formation.  In light of the Kelly court's observation that such damages are often hard to value in transactions involving the purchase and sale of real estate, this is an easy threshold to clear.

blessed a lower amount of liquidated damages, it was in a factual circumstance that differs materially from this case. In Howard, the court of appeals found that liquidated damages in the amount of $1000 was not "unreasonably low" considering that this amount was to cover damages incurred over a period of about eleven days. 811 N.E.2d at 1052.

Here, Kunelius was to receive $19,000 in liquidated damages.[13] This amount is approximately 2% of the total purchase price of $1.16 million, obviously less than the 5% that Massachusetts courts have upheld. But Kunelius failed to produce evidence or argue in the district court that the 2% liquidated damages clause was "grossly disproportionate" to a reasonable estimate of her actual damages at the time of contract formation, and therefore, this argument has been waived. CoxCom, Inc., 536 F.3d at 110 n.11. As a result, like the district court we too must

_____

[13]The Town and the Trust had six months to close. Closing had to occur on or before September 26, 2003 because the contract term granting an extension of the closing date was contingent on the "Chap. 40B approval process . . . proceeding forward." Although it could be argued that the pertinent time of contract formation for purposes of evaluating the liquidated damages clause was the time Kunelius negotiated the bona fide offer, evaluating the propriety of the damages clause at the time the Trust exercised its assignment is not a "second look" in the classic sense, because it was at that point that the Trust accepted the contract, and an agreement was formed between Kunelius and the Trust. See T.W. Nickerson, Inc., 898 N.E.2d at 878. Rather, a second look occurs when a court evaluates the propriety of a damages provision at the time of breach. See Kelly, 705 N.E.2d at 1116 (explaining that under a so-called "second look" analysis, a court looks to the actual damages resulting from the breach) (emphasis added).

conclude that the liquidated damages provision is enforceable in this case.

### C.  The Chapter 93A Claim

The appellant also presses a claim under the business-to-business provisions of the consumer protection statute, Mass. Gen. Laws ch. 93A, § 11.  It is helpful here to review briefly the structure of the Massachusetts consumer protection statute. Section 2 of this statute prohibits unfair and deceptive acts and practices, see Mass. Gen. Laws ch. 93A § 2(a), and sections 9 and 11 provide consumers and "businessmen" with private causes of action to enforce this prohibition.  Id. §§ 9, 11; see also Lantner v. Carson, 373 N.E.2d 973, 975-76 (Mass. 1978).[14]

In order for a defendant to be liable under the statute for damages from unfair or deceptive practices, the transaction at issue must have occurred in the conduct of "any trade or commerce," see Mass. Gen. Laws ch. 93A §§ 9, 11, which the statute defines as including "the advertising, [or] offering for sale . . . of

_____

[14]We note that appellant's complaint did not specify whether she was proceeding under the consumer or business protection provisions of Chapter 93A.  At summary judgment, counsel for the appellant specified for the first time that she was proceeding under the business-to-business provisions.  We note that had the plaintiff proceeded on the consumer prong of Chapter 93A, summary judgment for the defendants would have been appropriate because the plaintiff did not serve the defendants with a demand letter as required by that section.  See Mass. Gen. Laws ch. 93A § 9.

[selling] any property . . . real, personal, or mixed." Id. §(1)(b). Recognizing the potentially broad ambit of this statute, the SJC, relying on the statute's creation of a separate cause of action for "businessmen" who are harmed by unfair and deceptive practices, has made clear that "the proscription in [Mass. Gen. Laws ch. 93A § 2] of 'unfair or deceptive acts or practices in the conduct of any trade or commerce' must be read to apply to those acts or practices which are perpetrated in a business context." Lantner, 373 N.E.2d at 976.

In interpreting section 11, Massachusetts courts have looked not only at whether defendants were sufficiently involved in trade or commerce to be held liable under the statute, but also at whether plaintiffs were engaged in trade or commerce. This distinction is important because Massachusetts courts have understood that the private rights of action found in sections 9 and 11 are mutually exclusive. Frullo v. Landenberger, 814 N.E.2d 1105, 1112 (Mass. App. Ct. 2004) (citing Divenuti v. Reardon, 637 N.E.2d 234, 239 (Mass. App. Ct. 1994)); see also Milliken & Co. v. Duro Textiles, LLC, 887 N.E.2d 244, 259 (Mass. 2008) (noting that ch. 93A § 11 is only available after satisfaction of dual threshold inquiries of whether a transaction was commercial in nature, and whether the parties to the transaction were engaged in trade or commerce "such that they were acting in a business context") (citing Linkage Corp. v. Trs. of Boston Univ., 679 N.E.2d 191, 206-

07 (Mass. 1997))). Thus, in order for Kunelius to move past the threshold on her Chapter 93A claim, she must show (1) that the sale of the entire parcel, including her home and a horse farm, was a commercial transaction, and (2) that both she and the Trust were engaged in trade or commerce, such that this transaction occurred in a business context.

It is true that the Massachusetts courts have held that Chapter 93A does not "reach strictly private transactions such as the isolated sale of a private home." Begelfer v. Najarian, 409 N.E.2d 167, 175 (Mass. 1980). In that case, the court noted that whether an isolated transaction takes place in a "business context" must be determined from the circumstances in each case, such as the frequency of similar transactions, the motivation behind the transaction, and the role of the participant in the transaction. Id. at 176. The SJC has made clear, however, that a commercial transaction need not "take place only in the ordinary course of a person's business or occupation before its participants may be subject to liability." Id.

Considering these factors, the record can be read to support, at least in the summary judgment posture of this case, an inference that the sale of the property was a commercial transaction. Whether a party is engaged in trade or commerce is a question of fact, see Feeney v. Dell Inc., 908 N.E.2d 753, 770 (Mass. 2009), and thus our review on summary judgment is de novo,

-35-

with all inferences drawn in favor of the non-movant (here, the plaintiff). The record includes testimony from the appellant's real estate agent that he met Kunelius as a result of the need to move his horses to her farm. He further testified that as of May 24, 2007, the date of his deposition, his horse remained boarded on the appellant's property. The agent testified that Kunelius agreed to permit Cohousing (and eventually the Trust) to substitute a $50,000 deposit for a $10,000 deposit plus monthly payments of $1,500 to replace income she feared she would lose because "her boarding tenants would begin to leave" once they learned that her horse farm was for sale.[15] This evidence, combined with Kunelius's own affidavit stating that she rented stalls for horses on her property, harvested firewood, and was the barn manager, could permit a reasonable factfinder to conclude that Kunelius was not merely selling her home, but her business and the principal source of her livelihood.

Massachusetts courts have held that the sale of a business or substantially all of the assets of a business can be a commercial transaction subject to the proscriptions of Chapter 93A. Rex Lumber Co. v. Acton Block Co., Inc., 562 N.E.2d 845, 850 (Mass. App. Ct. 1990). In Rex Lumber, the defendant, Acton Block Co.,

_____

[15]The agent testified that he paid the appellant about $250 per month to board his horse at her farm. Thus, the record supports the inference that appellant likely received payment for boarding five horses at her farm at the time she entered the contract.

proposed to sell the land and building on which its former business, which had been discontinued for two years, had once operated, in order to fund the retirement of the defendant's owner. Id. at 846. The appeals court nonetheless held that the transaction was a commercial one made in a business context, under Lantner and Begelfer, despite the fact that it was not made in the ordinary course of business. Rex Lumber, 562 N.E.2d at 850. Thus, while it is a close question, we believe that at this summary judgment stage it is possible to conclude that the sale of appellant's horse farm and other property, from which she derived significant income, was a commercial transaction. Similarly, there is enough evidence in the record to support the conclusion that Kunelius was engaged in trade or business with respect to the transaction in which she disposed of all of the assets that she harnessed to produce her income, and fund her retirement, if Rex Lumber is good law. Therefore, the district court was on shaky footing in determining that Kunelius was not engaged in trade or commerce generally or with respect to this particular transaction.

Relying on our authority to affirm the decision of the district court on any basis made manifest in the record, States Res. Corp. v. The Architectural Team, Inc., 433 F.3d 73, 80 (1st Cir. 2005) (citing Uncle Henry's, Inc. v. Plaut Consulting Co., 399 F.3d 33, 41 (1st Cir. 2005)), the Trust urges that summary judgment was appropriate because the Trust was not engaged in trade or

commerce, based on its status as a nonprofit corporation.[16]   We

agree.   In Massachusetts, a defendant's nonprofit status is not

dispositive of whether it can be liable under Chapter 93A.  Compare

Linkage Corp. v. Trs. of Boston Univ., 679 N.E.2d 191, 207 n.34

(Mass. 1997) (noting that Massachusetts courts have held nonprofit

corporations liable under Chapter 93A) (citing Miller v. Risk Mgmt.

Found. of the Harvard Med. Insts., Inc., 630 N.E.2d 304 (Mass. App.

Ct. 1994))),   with Poznik v. Mass. Med. Prof'l Ins. Ass'n., 628

N.E.2d 1, 3-4 (Mass. 1994) (holding that MMPIA was not engaged in

trade or commerce because of its character as a "statutorily

mandated, nonprofit association" that was "motivated by legislative

mandate not business or personal reasons" (citing Barrett v. Mass.

Insurers Insolvency Fund, 592 N.E.2d 1317, 1319 (Mass. 1992))), and

All Seasons Servs., Inc. v. Comm'r of Health and Hosps. of Boston,

620 N.E.2d 778,779-80 (Mass. 1993) (finding that hospital operated

by Boston Board of Health and Hospitals, a municipal entity, was

---

[16]The district court dismissed the Chapter 93A claim against the Town because the Town assigned the ROFR to the Trust and never became a party to the appellant's contract with the Trust. Kunelius, 2008 WL 4372752 at *4 n.7.  The appellant has not challenged this ruling on appeal and it is therefore waived.  Stamp v. Metro. Life Ins. Co., 531 F.3d 84, 88 (1st Cir. 2008).  The district court, however, did not have occasion to determine whether a partnership between the Town and the Trust existed because it found that any such partnership was entitled to summary judgment for the same reasons that the Trust was entitled to summary judgment.  Kunelius, 2008 WL 4372752 at *1 n.1, *5.  As we, like the district court, conclude that the Trust was entitled to summary judgment on this count, we need not decide whether any such partnership existed because it too would be entitled to summary judgment.

not engaged in trade or commerce when it sought bids for operation of vending machines and canteen facility, as this operation was incidental to its charitable mission of providing medical services).

Determining whether a nonprofit defendant is beyond the reach of Chapter 93A is a "fact-specific . . . inquiry," but a nonprofit defendant will not be considered engaged in trade or commerce when it "undertakes activities in furtherance of its core mission." Linkage Corp., 679 N.E.2d at 209. Nevertheless, when "an institution's business motivations, in combination with the nature of the transaction and the activities of the parties, establish a 'business context' as contemplated in [Begelfer v. Najarian, 409 N.E.2d 167 (Mass. 1980)], G.L. c. 93A will apply because the institution has inserted itself into the marketplace in a way that makes it only proper that it be subject to rules of ethical behavior and fair play." Id.

In view of its conclusion that Kunelius was not engaged in trade or commerce, the district court did not evaluate whether the Trust was so engaged. In our view, the record viewed in the light most favorable to Kunelius, nonetheless requires the conclusion that TPL, undisputably a not for profit organization, was acting in pursuit of its core nonprofit charitable mission of preserving and conserving land. The fact that it planned to purchase Kunelius's property, renovate both houses, and resell one

-39-

or possibly both of them on the open market was merely a means to an end, and not intended to turn a profit -- like a hospital providing limited commissary services -- and therefore not actionable under Chapter 93A.  See All Seasons Servs., Inc., 620 N.E.2d at 780.  In that vein, we note that even in its commercial transactions, the Trust planned to promote its core charitable mission of land conservation by including conservation covenants that ran with the parcels it sold on the open market.  Thus, while it may be true that the record supports an inference that the Trust acted sharply in its dealings with Kunelius, the SJC has nonetheless made clear that where a nonprofit defendant is acting in furtherance of its core mission, Chapter 93A is not designed to reach such conduct.  Accordingly, summary judgment as to this count was properly granted to the Trust, the Town, and a partnership between the Town and Trust, if any such partnership existed.

### D.  Covenant of Good Faith and Fair Dealing

The district court found that the plaintiff did not plead a violation of the covenant of good faith and fair dealing in her complaint, but instead raised it for the first time in connection with cross motions for summary judgment.  Kunelius, 2008 WL 4372752 at *1 n.2.  The appellant argues that her complaint sets forth sufficient facts to state a claim for breach of the covenant and that the summary judgment record permits the inference that the covenant was breached; therefore, she should be permitted to pursue

-40-

this claim.  In support of this argument, Kunelius cites a number of Massachusetts cases explaining Massachusetts state pleading standards, but as we are in federal court, federal pleading standards apply.  Jerry Smith and Jeffrey Parness, 2 Moore's Fed. Practice § 8.04[1][A] at 8-23 (3d ed. 2007); see also In re Tower Air, Inc., 416 F.3d 229, 236-38 (3d Cir. 2005) (noting that district court mistakenly applied heightened requirements for state notice pleading standard in federal case).

In federal court, when a plaintiff raises a claim for the first time in response to a summary judgment motion, it is possible to treat the claim as a motion to amend the complaint under Rule 15(a) of the Federal Rules of Civil Procedure.  Sover v. Hattiesburg Pub. Sch. Dist., 549 F.3d 985, 989 n.2 (5th Cir. 2008). The plaintiff, however, made no such argument to the district court and has not advanced one here.  Therefore, we need not linger over this question.  See Cook v. Gates, 528 F.3d 42, 62 n.13 (1st Cir. 2008); Nieves-Vega v. Ortiz-Quiñones, 443 F.3d 134, 137 n.1 (1st Cir. 2006) (finding that claim raised for the first time at oral argument is, at best, forfeit).  In any event, it was not likely an abuse of discretion -- and certainly not plain error -- for the district court to deny such a circuitous request for an amendment after summary judgment motions had been docketed.  See Brooks v. AIG SunAmerica Life Assur. Co., 480 F.3d 579, 590 (1st Cir. 2007)(noting that party urging amendment of complaint at the

eleventh hour to fend of summary judgment must demonstrate that the proposed amendments are supported by the record) (citing Adorno v. Crowley Towing & Transp. Co., 443 F.3d 122, 126 & n.3 (1st Cir. 2006))); but see González-Pérez v. Hosp. Interamericano de Medicina Avanzada, 355 F.3d 1, 5-6 (1st Cir. 2004) (declining to find that district court abused discretion in permitting defendant to interpose timeliness defense supported by the record for the first time at summary judgment). Consequently, we affirm the district court's refusal to consider the appellant's claim for relief under the covenant of good faith and fair dealing. We express no opinion whether this claim would have been meritorious if adequately pled, but we note that the covenant of good faith and fair dealing is implied in every contract, including those involving rights of first refusal. Uno Rests., Inc., 805 N.E.2d at 964.

### E. Remaining Claims

In addition to these claims, the appellant has advanced a number of others, accusing the Town and the Trust of fraud and misrepresentation, intentional interference with her contractual relations with Cohousing, and through 42 U.S.C. § 1983, a violation of the Contracts Clause of the U.S. Constitution. We have reviewed these claims and find them to be without merit.

### 1. Fraud and Misrepresentation

As to the fraud and misrepresentation claim, the district court correctly noted that Kunelius had produced enough evidence to

permit an inference that TPL misrepresented both its ability and intent to purchase the property. Kunelius, 2008 WL 4372752 at *6. The court, however, also correctly concluded that Kunelius did not prove her reliance on any material misrepresentations made by the Trust. The appellant's brief on appeal identifies no legally cognizable reliance. Accordingly, summary judgment was appropriate as to that count.

## 2. Intentional Interference with Contractual Relations

Kunelius's argument on appeal regarding the intentional interference claim is that it was "erroneous for the [district court] to apply the more traditional intentional interference requirements, as the [district court] did in the instant case." The appellant has cited no case law or other indication that the SJC would modify these causes of action in her favor to account for the wrinkle of the statutory ROFR. Accordingly, we, like the district court, are powerless to modify them. We discern no error in the district court's application of the traditional standards for intentional interference with contractual relations in this case, see Kunelius, 2008 WL 4372752 at *5 (citing Draghetti v. Chmielewski, 626 N.E.2d 826, 868 (Mass. 1994)), and therefore that decision is affirmed.

## 3. Contracts Clause Claim

In perhaps her most ambitious and overreaching claim, Kunelius claims that Mass. Gen. Laws ch. 61, § 8 impermissibly

impairs a contractual obligation and therefore violates the Contracts Clause of the U.S. Constitution.  U.S. Const. art. I, § 10 cl. 1.  ("No state shall . . . pass any . . . Law impairing the Obligation of Contracts.").  We need not grapple with the question of whether a violation of the Contracts Clause is actionable under § 1983, or as the district court did, with whether the Trust's actions constituted state action, because we conclude that under the circumstances of this case the exercise of the ROFR, even with the Trust's subsequent default, was not a violation of the Contracts Clause.

It has long been understood that the seemingly absolute prohibition in the Contracts clause "must be accommodated to the inherent police power of the State 'to safeguard the vital interest of its people.'" Energy Reserves Group v. Kan. Power & Light Co., 459 U.S. 400, 410 (1983) (quoting Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 434 (1934)).  Therefore, as the Supreme Court has made clear, the Contracts Clause is not implicated unless a change in state law impairs a contractual obligation, and such impairment is substantial.  Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 42 (1st Cir. 2005).  In the present case, there was no change in state law, and further the ROFR at issue here, which allows a municipality -- or its chosen nonprofit -- to purchase land on the same terms as those in a bona fide offer, is not an impermissibly substantial impairment of a contractual right, if it

is an impairment at all.  Id. (citing McGrath v. R.I. Ret. Bd., 88 F.3d 12, 16 (1st Cir. 1996) (noting that even an impairment of contract that is substantial will be upheld if it is reasonable and necessary to fulfill an important public purpose).  Accordingly, the grant of summary judgment as to the Contracts Clause claim was proper.

### III.  Conclusion

The district court's grant of summary judgment is **affirmed.**