*38 KAYATTA, Circuit Judge, dissenting.
The plaintiffs argue that the district court should have considered evidence that the defendants’ chosen methods of passing fish downstream are less than fully effective at keeping the fish out of the dam turbines. Normally, consideration of such an argument would lead us to ask: What significance does the Agreement assign to evidence that a fish passage methodology chosen by an owner is of questionable effectiveness? The majority, drawn in by the myopic focus of the plaintiffs, instead asks and answers a different, much more abstract, question: Whether a determination of what a person desires can be informed by evidence of the results of his behavior? The majority then assigns contractual significance to its answer to this question by assuming that the Agreement anticipates evidence of effectiveness serving as a device for continuously reevaluating what the owners desire. Because the Agreement clearly anticipates that evidence of effectiveness will be dealt with very differently, I respectfully dissent.
The Agreement obliged each dam owner to take interim steps to protect fish migrating downstream while permanent solutions were devised. Specifically, the owners agreed to “continue and where needed improve existing interim operational measures” to reduce entrainment (i.e., the drawing of fish into the turbines) and to “eliminate significant injury or mortality ... to out-migrating species.” Accordingly, each owner agreed to “develop” a “plan for interim downstream passage facilities and/or operational measures to minimize impacts on downstream migrating fish.”[5] The Agreement gave great power to the signatory agencies when it came to the design of the owners’ plans: the owners had to consult with the agencies in preparing their plans, which were subject to agency approval “with evaluation based on qualitative observations.” Moreover, if the interim plan involved changes to the project facilities,[6] rather than just operational changes, the design of any “fish passage ... facility” had to be approved by the signatory agencies before being filed with the Federal Energy Regulatory Commission (“FERC”) or the Maine Department of Environmental Protection.
Importantly, if the plans involved diverting the fish around the turbines, the Agreement set no required level of effectiveness. It did, though, suggest that one hundred percent diversion efficiency was not required: the Agreement’s stated aim was to “diminish” entrainment, eliminate “significant” injury or mortality, and “minimize” impacts, “with evaluation based on qualitative observations.”[7] This is not to *39 say that the Agreement was indifferent to the effectiveness of whatever diversion methodologies the owners might develop. Any “newly constructed interim and permanent downstream fish passage facility]” was subject to effectiveness tests based on “targeted passage efficiency goals.” Agrmt. § III(F). If the new facilities fell short of those goals, the owners had to undertake good faith mitigation efforts at the behest of the agencies; if even these failed, the agencies could seek continued funding from the owners for alternative programs, including possibly trucking the fish around the dam.
The Agreement did not actually preclude an owner from proposing a plan that relied on achieving downstream passage by running the fish downriver through the turbines. But if an owner chose that option (after adult fish were inhabiting the impoundment above the dam), the owner first had to do quantitative fish-safety studies.[8]
The fork in the road thus established was clear: a facility owner had to have a plan for downstream passage that could get approved; if the plan involved only operational modifications (the preferred approach for three of the dams), evaluation was based on qualitative observations; if it involved new facilities, effectiveness studies were necessary (though not until the facility was in place). But if the owner wanted to avoid the cost and effort entailed in a diversion methodology, and instead achieve fish passage to the agencies’ satisfaction by running the adult fish through the turbines, it first had to do a quantitative study of whether turbine passage was safe.
There is no doubt about what the owners decided to do: they acceded to the agencies’ preference and sought to achieve fish passage by use of existing and upgraded diversionary measures. Specifically, as called for by the Agreement, the owners worked with the agencies to develop and implement — sometimes at significant cost — operational modifications and diversionary measures. The central changes have hardly been wink-and-nods. As an example, here is a description of the plan submitted by Hydro Kennebec in 2006:
[T]he interim downstream fish passage facility consists of a 10-foot-deep, 160-foob-long angled fish guidance boom in the project forebay leading to a 4-foot-wide by 8-foot deep gated slot cut into an existing concrete wall located between the turbine intakes and the bas-cule gates adjacent to the spillway. The boom is suspended from the surface by [sic] series of floating barrels and is cabled to lead ballast on the bottom, with each end attached to an existing concrete wall. The slot contains a downward-opening steel slide gate that is capable of passing about four percent of the project turbine flows, or a maximum of about 300 [cubic feet per sec *40 ond]. The gate discharges into an existing plunge pool that drains into the project tailrace.
The Maine Department of Environmental Protection expressly determined that this plan “satisfactorily address[ed]” the requirement in Hydro-Kennebec’s water quality certification (incorporated from the Agreement) that operational measures to ensure downstream fish passage be improved. The Department conditioned its approval, though, on Hydro-Kennebec’s proposing and conducting an effectiveness study in 2007 and, consistent with the Agreement, “in the event that it is revealed that certain interim downstream measures are needed to avoid significant downstream turbine injury and/or mortality ... consulting] with the resource agencies and agreeing] to undertake cost-effective measures designed to minimize mortality at the site.”
With their proposed operational and diversion plans approved, no owner ever chose to assume the obligation to justify the essentially “do-nothing” plan of relying on turbine pass-through as its fish passage methodology.[9] And since no owner sought approval of any plan relying on successful turbine pass-through to allow adult salmon or shad to travel downstream, none were required to do a pre-approval quantitative mortality study.
The agencies, it seems, have subsequently monitored performance, in some instances securing substantial modifications. For example, after the Hydro-Ken-nebec’s interim fish bypass was built in 2006, the plunge pool was deepened on agency request. And of the three dams for which the Agreement specified that operational modifications were the preferred method of achieving downstream passage, two have now installed fish-diversion booms.
It is fair to say that one cannot reasonably read the Agreement and the record and find that the owners, upon first presenting their plans to achieve downstream passage by diversionary measures, “desired” to achieve anything other than what they were obviously proposing. In other words, it is clear that no owner, in proposing its fish passage methodology for agency approval, sought to convince the agencies that simply running the fish through the turbine would do the trick. And as I read the majority’s opinion, my colleagues do not actually dispute this conclusion. Rather, they bring their focus forward in time beyond the “vantage point of [the] fork in the road” when the owners first sought approval for their plans. The majority reasons that if it turned out, down the road so to speak, that an approved fish passage methodology was not effective (to what extent, we are not told), and the owner continued using that methodology, then a fact finder could infer that the owner at that point began to desire to achieve fish passage by turbine pass-through.
The flaw in this reasoning is that it ignores how the Agreement addresses assessments of the effectiveness of the fish passage plans that were initially proposed at the fork in the road. Cf., e.g., Twombly v. AIG Life Ins. Co., 199 F.3d 20, 23 (1st Cir.1999) (under Maine law, noting that courts must examine the whole instrument — there, an insurance contract — to ascertain the intent of the parties and to eliminate possible ambiguity). As noted above, all of the plans were evaluated at *41 least qualitatively as part of the negotiations with the agencies — and their progress was reported through annual reports, with plans set to be reassessed at least by this year. Plus, any “newly constructed interim ... downstream fish passage facilities” are, once operational, subject to effectiveness tests based on “targeted passage efficiency goals.” Agrmt. § III(F). Section III(F) further provides:
In the event that effectiveness studies show that passage at individual projects is less than the targeted passage efficiency goals, [the] dam owners will make a good faith effort to achieve these goals through modification of facilities and/or operations, following consultation with the resource agencies. In the event that studies show that, subsequent to said modifications, passage at individual projects continues to be less than the targeted efficiency goals, resource agencies may seek continued funding for trap and truck or other programs, or other mitigation from [the] dam owners. Any disputes will be handled through the FERC process.
This language makes clear that: (1) no changes to new facilities need be made by the owner unless “targeted passage efficiency goals” are missed; (2) if goals are missed, then the next step is not to deem that the owners “desire” the goals to be missed, but rather to require the owners to make good faith modification efforts, in consultation with the agencies; (3) if the modifications fall short in the judgment of the agencies, then the resource agencies “may seek continued funding for trap and truck or other programs....”; and (4) any disputes will be resolved through the FERC process. In short, the Agreement creates a process of what seems to be near-constant interaction and negotiation between the dam owners and the signatory agencies.
But, says the majority, suppose some fish get through the booms? Could not the court then rule that, notwithstanding the owner’s conceded desire at the time it opted to rely on diversionary methods to secure agency approval for its plan to pass fish downstream, the owner later developed a desire to use turbine passage? By this logic, if the diversionary method chosen is discovered to be anything less than one hundred percent effective, the owner might be found to have developed a “desire” that some fish go through the turbine. This blindered reading, however, ignores and undercuts section III(F) as applied to interim facilities for downstream fish migration. Read in context, the language upon which the majority hinges its analysis is plainly meant to set the terms of owner-agency negotiation by requiring the owners to conduct safety studies before proposing the turbines as their chosen method of moving the fish downstream — not to serve as a pretext for revisiting and re-labeling the owner’s choice based on its effectiveness. Simply put, given the existence of section III(F), it makes no sense to claim that the parties buried in section IV an unstated, stan-dardless procedure for using evidence of effectiveness in an entirely different manner that trumps the actual procedures upon which the parties expressly settled. Cf. Fishman v. LaSalle Nat. Bank, 247 F.3d 300, 302-03 (1st Cir.2001) (in construing an unclearly drafted commercial note, explaining that “[i]t is centrally important” that the prevailing interpretation “make[] sense — that is, [carry] out what one might imagine to be a plausible objective of parties so situated.... Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons.”)
Sensing this problem, the majority posits the possibility that an owner’s diversion *42 facility might turn out to be ninety-nine percent ineffective (presumably on a sustained basis, even when maintained in accordance with the plan and approval). Plaintiffs of course point to no evidence in the record to show that such is actually the case. Even if it were so, though, the Agreement would leave it to the agencies to decide whether to have the owner revise its method, go to a trap-and-truck program, or do something else. Of course, if at any point the owner falls back on proposing that it can satisfy its obligation to “diminish entrainment ... and eliminate significant injury or mortality ... to out-migrating” fish by sending them through the turbines, then quantitative safety studies would have to accompany that proposal. But that would be because, within the context of plan negotiations with the agencies (i.e., the context in which the term “desire” is used), the defendants actually “desired” — that is, proposed, chose, or requested — to rely on turbine passage to satisfy their fish protection obligations.
I do concede that the majority is not deciding now whether there is enough evidence to create an issue of material fact; it only says that the district court need “consider” the evidence of effectiveness. But even this modest requirement must mean that the majority believes that some amount of evidence of ineffectiveness could affect the outcome of the case. See Fed. R.Evid. 401(b); Fed.R.Civ.P. 56(a) (requiring disputes of “material” fact). The able district court judge will quite rightly ask: effectiveness by what measure, given that there is no objective standard set out in the Agreement? And toward exactly what end, in light of section III(F) and the Agreement’s overall commitment to resolving fish-safety concerns through ongoing agency-owner negotiations? Suppose, for example, the targeted passage efficiency goals are met, but a nontrivial number of fish still evade diversion: can the owners be deemed to desire to use turbine passage? Suppose the goals are not met, but the resource agencies have not opted for mitigation such as a long-term shutdown pending more quantitative studies;[10] should the district court overrule the agencies’ efforts under section III(F), and by what standard of review? The majority offers no guidance on these questions, all of which are reasonably raised by the new version of the Agreement forged by what the majority reads into the word “desire.” Instead, the majority casts the case adrift without a paddle, further extending the litigation over fish passage methodologies that the parties to the Agreement thought they had managed to avoid.
By holding that the District Court must “consider” effectiveness in order to gauge ongoing “desire” in some abstract sense, the majority also allows the plaintiffs to do indirectly what they cannot do directly. I do not dispute that the plaintiffs could sue under the Clean Water Act for a breach of a term of the Agreement as incorporated into a water quality certification. Thus, if the provisions of Section III.F were being breached, citizens could sue. Citizen suit or otherwise, however, no court can rewrite the otherwise lawful manner in which the parties agreed to address modifying fish passage methodologies based on post-implementation evidence of effectiveness.
Imagine a plaintiff brings suit claiming that the owners are in violation of the Agreement because X% of the adult salmon are passing through the turbines. I would think it clear that no such claim could survive, because the Agreement plainly sets no objective measure against *43 which to compare a facility’s effectiveness, and gives the agencies discretion to approve the interim downstream passage plans. And those approvals stand unchallenged. Now consider the gist of what these plaintiffs say: “I want a court to find that, because X% of the salmon pass through the turbine, the owner must desire turbine pass-through as its method to achieve downstream passage, and therefore the agency should not have approved the diversionary plan without first seeing quantitative fish safety studies.” This is nothing more than a re-packaged version of the presumably defective hypothetical claim discussed above. By deeming evidence of effectiveness “relevant,” the majority allows the plaintiffs to act as though the term “desire” both established a de facto tipping point (albeit one to be guessed at under the totality of the circumstances) and set the remedy for failing to attain it (when in fact section III(F) serves that function, at least for new facilities). Absent some actual effort by the defendants to propose or rely on turbine passage as a way to satisfy their fish-protection obligations, however, failure to do a quantitative effectiveness study neither violates the Agreement nor generates a cause of action for the plaintiffs.
For the foregoing reasons, any determination of how the owners desire to achieve fish passage under the Agreement must be based on the nature of the plans that they proposed and developed with the agencies. Any judgment about the adequacy and effectiveness of those plans was one to be made by the agencies in approving and monitoring those plans, not by the district court peeking over the agencies’ shoulders. And any disputes concerning what measures the agencies required to improve effectiveness were to be handled through the FERC dispute resolution process.
In rejecting this reasoning, the majority opinion regrettably upends this 16-year-old Agreement, ironically by undercutting one of its central purposes: “avoiding] extensive litigation over fish passage methodologies.” Crafted with the aid of five environmental groups[11], the Agreement marked a significant turning point in the long history of Maine’s exploitation of one of its great rivers. By facilitating the transfer of the Edwards Dam to the state, and securing some of the funds for dam removal, it led to the eventual removal of the Edwards Dam — an event etched in the memory of most Mainers desiring to see industry, environmental groups, and regulators work to find a balance that better protects the state’s natural resources. Toward that same end, the Agreement funded the next phase of a fisheries restoration program for the Kennebec, and led to the installation of new interim downstream fish passage facilities at some of the hydroelectric project sites. I hope that the majority’s willingness to read such an Agreement in a manner that ignores its overall structure will not deter owners from making other beneficial agreements with state and federal resource agencies for fear that third parties will flyspeck them for supposed ambiguities that none of the parties to the agreement claims exists.

.The available "existing interim operational measures” varied somewhat between projects; for all four of the projects at issue on appeal (the Weston, Lockwood, Shawmut, and Hydro-Kennebec Projects), they included "controlled spills” and "temporary turbine shutdowns”; for Shawmut, Weston, and Lockwood, they also included use of sluice-ways. For the latter three projects, the Agreement specified "that fish passage by means of sluiceways and/or controlled spills [is] the first and preferred approach to interim downstream fish passage.” Hydro-Ken-nebec had no such term.

. The Agreement distinguishes between new "facilities” (evidently, whatever diverts the fish away from the turbines, including floating booms) and "new diversionary structures.” The Agreement assured Lockwood, Shawmut, and Weston that its terms did not require " [construction of new diversionary structures to achieve success,” but Hydro-Kennebec received no such assurance.

. Indeed, the 1998 amendment to Weston’s water quality certification reads: "Interim Downstream Fish Passage^] The applicant shall continue and where needed improve existing interim operational measures to diminish entrainment, allow downstream passage, *39 and eliminate significant injury or mortality to out-migrating anadromous fish, in accordance with the terms of the [Agreement].”

. The defendants likely conceded in their answer to the complaint that adult salmon inhabit the impoundment above Hydro-Kenne-bec. The district court assumed that the habitation requirement was met for all dams, and I do likewise for present purposes.
The rules are different for juvenile fish. At Lockwood, Shawmut, and Weston, if passing juvenile salmon and shad downstream by the preferred methods (sluiceways or spills) is not '‘successful”, then to the extent that the owners want to satisfy their obligations under the Agreement by choosing to send the fish through the turbines, site-specific qualitative survival studies are needed. (The requirement for site-specific qualitative studies at Hydro-Kennebec has no defined relationship to the "success!]” of other methods, as no preferred method is named.)

. Evidently, "[a]s part of the ... Accord and prior to the listing of Atlantic Salmon [as endangered], turbine passage had previously been approved as a downstream passage route for juvenile fish, based on observation studies indicating no significant injury or mortality." We are concerned here, however, only with adult fish.

. Short-term turbine shutdowns are (contrary to the suggestion of defendants) specifically anticipated in the Agreement as available interim operational measures.

. The environmental groups, collectively known as the Kennebec Coalition, were American Rivers, Inc., the Atlantic Salmon Federation, Kennebec Valley Chapter of Trout Unlimited, the Natural Resources Council of Maine, and Trout Unlimited.